## THE STATE v. EDWARD KELLEHER, Appellant.

### Division Two, March 5, 1907.

1. **DEFENDANT AS WITNESS: Inadvertent Remark of Counsel: No Rebuke of Court.** In presenting his objection to the admissibility of a communicated threat, the attorney for the State inadvertently stated, "Having presented his gun as they claim, and as the defendant must testify in this case." Objection was made to the remark, as a statement by the attorney that defendant must testify in the case, and thereupon the court ordered the remark stricken out, saying it was improper, and directed the jury to entirely disregard it, and the attorney changed it to, "That is what the defendant will have to testify to, if he testifies." *Held,* that under the circumstances a rebuke by the court of the attorney was not necessary, but the court in sustaining the objection and directing the jury to disregard the remark did all that was seemingly necessary, and

State v. Kelleher.

the judgment will not be reversed on the ground that the State's attorney violated the statute which forbids any reference to defendant's failure to testify.

2. ————: ————: ————: General Rule. When the jury are told in clear and emphatic terms that no inference can be drawn against the accused because of his failure to testify in his own behalf, this dispels the error of an inadvertent reference to the fact that defendant will testify.

3. MURDER: Instruction for Manslaughter: Imperfect Self-Defense. Where there is no evidence of any circumstance connected with the homicide tending to show that defendant intended an ordinary battery merely, but on the contrary the evidence shows that defendant used upon deceased a deadly weapon in a difficulty which he himself provoked, there is no imperfect self-defense in the case, and no room for an instruction on manslaughter in the fourth degree, for the facts show that the assault was made with a felonious intent.

4. ————: ————. Reasonable Provocation. To apply a vulgar epithet to deceased, or demanding to know if deceased is looking for trouble, is not a reasonable provocation under the law which makes it manslaughter to intentionally kill a human being, in the heat of passion, on a reasonable provocation, etc.

5. EVIDENCE: Res Gestae: Subsequent Narrative: Murder. Deceased was shot in one saloon, and walked to another a block or so away and began to undress himself, and five or ten minutes thereafter two policemen entered and he told them how the shooting occurred. *Held,* that it was not permissible to permit those officers to detail, as a part of the *res gestae,* what deceased said to them at that time. The statements were not contemporaneous with the transaction, they were simply narratives of a completed past occurrence, and were therefore nothing more than hearsay.

6. ————: Uncommunicated Threats. Uncommunicated threats made by deceased against defendant are admissible for the purpose of showing who was the probable aggressor.

7. ————: Statements Made in Presence of Defendant After Arrest. A person under arrest for a specific offense is not in a position to make any denial of a statement made by deceased in his presence regarding the connection of such person with the offense, and his silence under those circumstances will not warrant any inference against him.

8. ————: Dying Declaration: Form. The form of a dying declaration is immaterial. Whether made in narrative form, or made in response to questions asked by an attorney or other person and taken down by a stenographer, it is competent evidence if it is clearly shown that it was made under a sense of impending dissolution.

9. ——: ——: ——: **Sense of Impending Dissolution.** Two days after the shooting and while the deceased was lying in the hospital, he made an *ante-mortem* statement, which was taken down in shorthand, transcribed, signed by him and witnessed. It contained these words: "Q. You know you are dangerously injured and liable to die? A. Yes, sir." Immediately after the shooting deceased was taken to a saloon, and requested that a doctor and priest be sent for. To a witness he said, "I am a croppy, I am a dead one; there ain't nothing to it." At the hospital he said "it was all off with him." *Held,* that these remarks, when taken in connection with the attendant circumstances, the condition of the wound in the abdomen and his state of mind from the first, show that the statement was made under the impression of almost immediate dissolution, and it was competent as a dying declaration.

10. ——: ——: **Extraneous Matters.** Statements contained in the proffered dying declaration which do not relate to the killing nor to the facts and circumstances attending it, are not admissible in evidence.

11. **DISCREDITING DEFENDANT.** Where defendant has not put his reputation in issue or become a witness in his own behalf, it is error to permit the State to ask another witness if he had not been sent to the penitentiary under a joint indictment against him and defendant.

Appeal from St. Louis City Circuit Court.—*Hon. Robert M. Foster,* Judge.

REVERSED AND REMANDED.

*Thos. B. Harvey* for appellant.

(1) Error was committed by the circuit attorney and the court in violating the provisions of section 2638, by referring to the right of the defendant to testify in the presence of the jury and while discussing the admissibility of testimony. State v. Weaver, 165 Mo. 13; State v. Guinn, 174 Mo. 686; State v. Snyder, 182 Mo. 462; McKnight v. U. S., 54 U. S. Cir. Ct. App. 367; Wilson v. U. S., 149 U. S. 60; Yarbrough v. State, 70 Miss. 593; State v. Baldoser, 88 Iowa 56; State v. Graham, 62 Iowa 111; State v. Ryan, 70 Iowa 156. (2) The court should have given the instruction on the doctrine

of incomplete self-defense, or one in lieu thereof. Partlow Case, 90 Mo. 608; State v. Gordon, 191 Mo. 114; State v. Gilmore, 95 Mo. 554; State v. Rapp, 142 Mo. 448; State v. Garrett, 170 Mo. 397. (3) The court should have given the instruction requested by the defendant on the subject of manslaughter resulting from hot blood, or one in lieu thereof. (4) Statements made by the deceased in Bumberry's saloon at 2214 Pine street, in regard to how he was shot, were not a part of the *res gestae,* and should not have been admitted. State v. Hudspeth, 150 Mo. 27; State v. Ware, 62 Mo. 597; State v. Snell, 78 Mo. 240; State v. Brown, 64 Mo. 367; State v. Evans, 65 Mo. 574; State v. Day, 100 Mo. 242. (5) The court erred in excluding as incompetent uncommunicated threats, after the evidence was conflicting as to whether the deceased or the defendant was the aggressor. State v. Spencer, 160 Mo. 123.

*Herbert S. Hadley,* Attorney-General, and *Rush C. Lake,* Assistant Attorney-General, for the State.

(1) The question of the admissibility of the testimony of the witnesses, as to what was said by the deceased in the presence of the defendant, is now of no importance, for the reason that the defendant admitted the shooting and relied upon self-defense as his justification of the murder. At the time defendant was taken in the presence of the deceased, he stood in the attitude of denying any connection with the affair, and the police were endeavoring to locate the person who did the shooting. The charge was made by deceased, at the time he was in the hospital, that he knew the man who had shot him, but did not know his name, and defendant was taken to the bedside of deceased, to ascertain if he, defendant, was the one who did the shooting. Defendant was identified, and complains because the police officers were allowed to testify to the fact that deceased identified defendant, and that defendant stood

mute. If there had been a denial, upon the trial, that defendant shot deceased, he might claim that he was prejudiced by the identification, and the subsequent testimony that he was so identified, but when that theory of his defense was abandoned, the error, if error it was, was not prejudicial. (2) Defendant complains because the court would not allow him to show that the defendant was in the habit of carrying concealed weapons. Upon this proposition see State v. Griffin, 87 Mo. 613.

BURGESS, J.—Defendant was convicted in the circuit court of the city of St. Louis of murder in the second degree, and his punishment fixed at twenty-five years' imprisonment in the penitentiary, under an indictment preferred against him by the grand jury of said city charging him with murder in the first degree, in having at said city, on the 29th day of January, 1905, shot with a pistol one Thomas Sullivan, from the effects of which said shot said Sullivan, at said city, to-wit, on the 2d day of February, 1905, died. Defendant appeals.

The shooting occurred at Walsh's saloon, at the northeast corner of Twenty-second and Pine streets in said city, between two and three o'clock in the morning. The defendant was at the time one of Walsh's bartenders, but was not then on duty. He and some of his associates, however, were standing at the bar. The deceased was a prize fighter.

The evidence on the part of the State tended to show that Sullivan, the deceased, was standing near a filter at the north end of the bar, which ran north and south; that next south of him was a friend of defendant's by the name of Sellinger, and at the extreme south end of the bar, next to a partition caused by swinging doors, near the corner entrance to the saloon, stood the defendant, Edward Kelleher, and that north of the bar stood Buck Taylor. The other persons in the saloon

were the barkeeper, Gerwitz, and two or three who were standing near the west side of the room.

John Howard, a witness for the State, testified as follows:

"Sullivan and I walked into the saloon; we walked to the bar, passed Kelleher and Sellinger, and I stepped behind; Sellinger and Sullivan went back of me, near the filter; walked to the bar, and I said to the bartender, 'Give me a little booze. What do you want, Tommy?' He says, 'I want the same.' So he gave us water on the side, and I told him that I wanted soda. So he gave me the soda, and I poured out my whiskey, and drank the whiskey, like that (illustrating), reaching for my soda to drink it, and had it to my lips like that, and was standing like that at the bar (stands up and illustrates), and I saw when I turned around, after having it like that, to say, 'Here is luck,' I saw Kelleher standing there. He said to Sullivan, he says, 'You [applying a vile epithet], you are a fighter?' He says, 'This ain't no place to come looking for trouble.' And as he did why Sullivan jumped back, like that (illustrating), and Kelleher — I don't know where he pulled the revolver from, or where he got it from — but I saw the gleam of the revolver like that, like you would throw a piece of paper or anything through the air; but I heard a shot, and I started to run; then I heard another shot. I run out the front door."

"Q. Did you notice whether or not Kelleher had that gun in his hand at the time you turned around when you first noticed him? A. I couldn't say whether he did or not.

"Q. Did you afterwards see the gun in his hands? A. I saw the gun when he pulled it.

"Q. When he was drawing it down you saw it for the first time? A. Yes, sir. When he came up to him he came up to him like I walk up to you, saying, 'You are a fighter, you come in here looking for trouble.'

"Q. What kind of a gun was it? A. I couldn't say.

"Q. Was it nickel plated? A. No, looked like a black gun to me.

"Q. Looked like one of these blue steel guns? A. Yes, sir; looked like a black gun.

"Q. Which way did you run? A. I run out of the front door.

"Q. The door you came in? A. Yes, sir.

"Q. You came in the front door, as I understand, and passed through these doors here in the partition? A. Yes, sir.

"Q. What kind of doors? A. There is glass in them. They are swinging doors.

"Q. Swinging doors? A. Yes, sir.

"Q. What did Sullivan do? A. I couldn't say. I didn't wait to see. I ran.

"Q. Well, did you see him turn, or did he turn and run while you were there? A. I didn't wait to see.

"Q. You didn't wait to see? A. No, sir. As soon as he reached back I turned. I saw the flash of the gun and saw the flash of the shot and run.

"Q. How soon after Kelleher addressed him before these shots rang out? A. Well, I couldn't say the limitation of time.

"Q. You were there, you were a witness to it? A. Yes, sir.

"Q. You turned and saw Kelleher? A. Yes, sir.

"Q. What occurred then? Just tell how fast this thing took place. A. I don't know the exact time. All I know here you can judge for yourself, that Sullivan jumped back, and then I saw the flash of the revolver, like pulling it from your pocket, like that (illustrating), and then a shot, and I turned to run and I heard another shot, and I ran out the front door.

"Q. Do you know whether Sullivan had a gun or not? A. I couldn't say."

Two days after the shooting and while the deceased was lying in the hospital, he made an *ante mortem* statement, which was taken down in shorthand, transcribed, signed by the deceased and witnessed.

The *ante mortem* statement is as follows:

"Q. State your name? A. Thomas J. Sullivan. Q. You are known as 'St. Louis Tommy Sullivan?' A. Yes, sir. Q. You know you are dangerously injured and liable to die? A. Yes, sir. Q. How old are you, Tommy? A. Twenty-four. Q. Where were you born? A. St. Louis. Q. Where do you reside? A. 3456 Lindell boulevard. [Last two questions and answers objected to as irrelevant and immaterial and not a part of the fatal occurrence; which objection is by the court overruled; to which ruling of the court the defendant, by counsel, duly excepted then and there at the time.] Q. Now, we want a correct statement of what took place at Walsh's saloon, 2131 Pine street, Sunday morning, the 29th inst., and we want the name of those who were present when the shooting occurred. What time did you go into the saloon? A. About three o'clock in the morning. Q. Who was with you? A. Johnnie Howard. Q. He went with you in the saloon? A. About three o'clock in the morning. Q. Who was with you? A. Johnnie Howard. Q. He went with you in the saloon? A. Yes, we went in together. Q. Was anybody else with you? A. No, sir. Q. Where did you meet Johnnie Howard? A. Twenty-first and Chestnut street. Q. Where did you go then? A. We went to Joe Daneri's, Twenty-second and Chestnut streets. Q. How long did you stay in Daneri's? A. About three-quarters of an hour. Q. Did you have any drinks while in there? A. Yes, sir. Q. About how many? A. Three, I believe. Q. What was it, beer or whiskey? A. Whiskey. Q. Where did you go from Daneri's?

A. Over to Walsh's; Johnny says 'Let's go in and get a drink.' Q. Where did he say that? A. When we got opposite Walsh's. Q. You and Johnnie Howard went in there together, that is, to Walsh's together? A. Yes, sir. Q. Who was in there when you and Howard went in? A. This fellow who shot me. Q. What was his name? A. Eddie Kelleher. Q. Did you ever see him before? A. Yes, sir. Q. Do you know him? A. Know him to speak to him. Q. Have you seen him since the shooting? A. Yes, sir. Q. Where did you see him? A. They brought him down here. Q. Who brought him here? A. Some officers. Q. Did you recognize him as the party who shot you? A. Yes, sir. Q. Who was with Kelleher when the shooting occurred? A. I don't know what his name was. Q. Did you ever see him before, that is, the man who was with Kelleher? A. Not that I know of. Q. Would you know him if you were to see him again? A. I don't know. Q. How did the shooting occur? A. Well, when I walked in I seen this fellow that shot me and I says, 'How do.' We walked to the middle of the bar and Johnnie and I ordered a drink, and this fellow [Special Officer M. J. O'Brien, what fellow?] Eddie Kelleher says, 'Did you come out here looking for trouble?' and then pulled out his revolver and shot me. I believe he shot me twice. Q. How many shots took effect? A. One. Q. Where did he shoot you? A. In the stomach. Q. Were you facing him when he shot you? A. I was standing against the bar and I looked around when he first shot. I turned and ran for the back door. I was shot before I started running. Q. Was the bartender there and on watch when you went in? A. Yes, sir. Q. Do you know him? A. No. Q. Was he a white man or a negro? A. He looked like a white man to me. He was dark complexioned. Q. Was he on watch when you got shot? A. Yes, sir, he waited on us. Q. Did he leave the saloon in charge of the por-

ter or anyone else while you were in there? A. No, sir; I was only in there a few minutes. Q. Were you sober, Tommy? A. Yes, sir. Q. What did Howard do after you were shot? A. I don't know, I ran over to Bumberry's saloon. Q. What is the number? A. 2214 or 2216 Pine, I believe. (Q. What did you say when you ran into the saloon? A. I told him that I was shot. Q. Told who? A. Bumberry. Q. Did anyone telephone to you at any time Saturday night or Sunday morning? A. Yes, sir. Q. Who was it, Tommy? A. Johnnie Howard. Q. What time did he telephone? A. About two o'clock Sunday morning. He telephoned from Manley's saloon. Q. Where were you? A. In Mike Howard's; I then left and met him on the sidewalk in front of Manley's.)"

The above matter set out in parenthesis was objected to by counsel for defendant as incompetent, and not a part of the fatal occurrence; which objection was by the court overruled; to which ruling of the court the defendant, by counsel, duly excepted then and there at the time.

There were two shots fired by defendant, one of which took effect, entering the abdomen on a level with the ninth rib and coming out an inch to the left and one-half inch above the umbilicus.

The defendant was arrested the day of the shooting, and was taken before the deceased who identified him as the man who shot him.

The evidence on the part of the defendant tended to show that the deceased, recently before the shooting, had made threats against the defendant, some of which had been communicated to him and others not, and that, in connection with such threats, deceased had referred to some difficulty which had occurred some days before between him and the defendant; that deceased had exposed a pistol upon several occasions; that deceased and John Howard had been drinking together the eve-

ning before the shooting, and a few minutes before it occurred they entered Walsh's saloon, but that deceased gave no token of recognition to the defendant or either of those standing there with him.

Thomas McTague, a witness for the defendant, testified as follows: "I heard Sullivan pass some remark, but I didn't understand what he said, and I heard Kelleher say, 'This is no place to come to look for trouble,' and . . . . Sullivan stepped out from the bar and says, 'Yes, G-d d-n you,' and goes back and comes up with the revolver. Kelleher gets back and fires two shots—fires a shot, and Sullivan turns this way, and another shot is fired, and Sullivan drops his revolver and runs toward the back of the saloon."

McTague picked up the revolver from the floor and placed it on the top of the music box which stood opposite the bar, and left the saloon. The police, a short while after, found and took possession of the revolver.

After deceased had entered Bumberry's saloon, and while he was yet lying on a cot there, witness Hamilton says that he said to deceased, "What is the matter, Tommy?" and that the deceased replied, "Oh, nothing; he beat me to it."

The court instructed for murder in the first and second degrees, and upon the law of self-defense.

The defendant insists that error was committed by the circuit attorney and the court in violating the provisions of section 2638, Revised Statutes 1899, by referring to the right of the defendant to testify, in the presence of the jury, and while discussing the admissibility of testimony.

It appears from the record that while the admissibility of a communicated threat was under discussion, the following occurred:

"Mr. Sager: I object for this reason: A communicated threat not connected with the overt act of the deceased in the affray is not admissible, and for that

reason we object to the question, and object to an answer being made to it; we object to the question and to an answer being made to it on the ground that the defendant's case as stated by counsel, and that is the theory of the case to which he is committed, does not bring in issue any proposition leaving any doubt in defendant's mind as to the intent of the deceased to kill him; does not leave any doubt in the mind of anyone, that having presented his gun as they claim, *and as the defendant must testify in this case,* having applied an epithet—

"Mr. Harvey: I object to that statement, that 'as the defendant must testify in this case.'

"Mr. Sager: I will strike it out.

"Mr. Harvey: It is not for you to strike anything out of the record.

"Mr. Sager: I have the right to withdraw the statement, and I have the right to withdraw that part of the statement.

"Mr. Harvey: It is, as a matter of fact, made in the presence of the jury to the effect that this defendant must testify in this case, and that fact is expressly forbidden to be commented upon by the circuit attorney under the statute. Therefore we object and except to it.

"The Court: The exception is well taken, and the remark is withdrawn and will be stricken out. The jury will pay no attention in reference to whether the defendant may or may not testify in the case.

"Mr. Harvey: The fact that the court may order the matter stricken from the record, your honor, counsel for defendant insists does not remove the effect of the remark from the minds of the jurors, nor can it be removed therefrom by the suggestion of the court or order of the court.

"The Court: I say that the motion made by you to strike it from the record is sustained.

201 Sup—40

"Mr. Harvey: I did not make such a motion, your honor, I beg pardon.

"The Court: Do you want it to stay in the record?

"Mr. Harvey: It is not my duty to ask it to be stricken from the record.

"The Court: Well, the court will order it stricken from the record of its own motion, and further that the remark was withdrawn by the circuit attorney, and further the jury will be instructed to pay no attention to the remark made about the defendant testifying, or whether the defendant does or does not testify.

"Mr. Harvey: To which statement and ruling of the court the defendant excepts as not effecting the purpose of the statute and not remedying the evil done.

"The Court: The Supreme Court has said that is all the court can do.

"Mr. Harvey: I am not responsible for the position of the court, your honor.

"The Court: Proceed.

"Mr. Sager: In order to qualify the statement, if it is in any sense in the case, or can be taken advantage of, I desire to say that it is what the defendant will have to testify to, if he testifies."

The argument of defendant's counsel is that both by the statement of the circuit attorney and that of the court the attention of the jury was pointedly directed to the fact that the defendant could testify; that no rebuke was administered or other means adopted to cure the injury, and that, indeed, there was no way to remedy the evil done the defendant.

Section 2638, Revised Statutes 1899, provides: "If the accused shall not avail himself or herself of his or her right to testify, or of the testimony of the wife or husband, on the trial in the case, it shall not be construed to affect the innocence or guilt of the accused, nor shall the same raise any presumption of guilt, nor be referred to by any attorney in the case, nor be con-

sidered by the court or jury before whom the trial takes place."

If this statute is to be construed according to the letter, it absolutely prohibits any reference by an attorney in the case to the right of a defendant upon trial to testify in his own behalf, or to his failure to do so, and it makes no difference as to the time, whether in the opening statement of counsel, or in the argument of the case before the jury. But this does not seem to be the construction adopted by this court. It has frequently been held by this court that, when improper and prejudicial remarks are made by an attorney during the trial of a cause, if they are immediately followed by a proper rebuke of the counsel making them, and the jury instructed to disregard them, such remarks will not constitute reversible error. [State v. Graves, 95 Mo. 516; State v. Dusenberry, 112 Mo. 277; State v. Brandenburg, 118 Mo. 187; State v. Howard, 118 Mo. 145; State v. Taylor, 134 Mo. 109.] But in this case there was no rebuke of counsel by the court; nor do we think that, under the circumstances disclosed by the record, a rebuke was absolutely necessary or would have served any good purpose if administered. When objection to the remark was made by counsel for defendant, the court promptly sustained the objection and instructed the jury to disregard the improper remark. The circuit attorney then qualified the statement or remark by saying, "It is what the defendant will have to testify to, if he testifies." The remark made by the circuit attorney, in the first instance and which was afterwards practically withdrawn by him, was evidently made through inadvertence and in the excitement of a closely contested trial, and in sustaining an objection thereto and directing the jury to disregard it, the court did all that was seemingly necessary under the circumstances.

In State v. Kring, 64 Mo. l. c. 395, this court, in speaking of objectionable remarks made by one of the

attorneys representing the State, says: "The judge presiding at the trial, in our opinion, should not have permitted such remarks to be made on the close of the argument, without a prompt correction." It does not seem in that case that this court thought a rebuke of the attorney making the remarks was necessary, a prompt correction having been deemed sufficient. So, in the case of State v. Fitzgerald, 130 Mo. 1. c. 436, the court in passing upon an improper remark made to the jury by counsel for the State in the argument of the case, said: "The court thereupon checked the counsel, the remark was withdrawn by him, and the jury was told by the court not to consider it. While it must be conceded that the remark was out of place, and should not have been made, yet when it was withdrawn by the counsel who made it, and the court directed the jury not to consider it, it could not have been prejudicial to the rights of defendant, and the judgment should not be reversed on that ground alone."

It is clear from the adjudications that if the court, in addition to what it did do, had at the same time rebuked the attorney, this would have removed the sting of the remark and corrected the error. But, as stated, we do not think that, under the circumstances disclosed by the record, a rebuke was necessary.

While counsel for defendant cites many decisions of courts of high authority, viz.: McKnight v. United States, 54 C. C. A. 367; Wilson v. U. S., 149 U. S. 60; Austin v. People, 102 Ill. 261; Yarbrough v. State, 70 Miss. 593; Coleman v. State, 111 Ind. 563; State v. Baldoser, 88 Iowa 56; State v. Graham, 62 Iowa 111; State v. Ryan, 70 Iowa 156, which decisions tend to sustain his contention that such an error is incurable, not one of them, however, seems to attach any importance to the failure of the court to rebuke the attorney at the time for the improper remarks made.

It is said in McKnight v. U. S., supra: "There are

two lines of decisions in the State courts arising upon facts disclosing a reference to this right of the defendant to testify by the court or prosecuting attorney. One line of cases holds that, when any reference has been made in the presence of the jury to the fact that the accused may testify, the error is irretrievable, and no subsequent instruction can dispel the effect of the allusion. In the very instruction not to draw inferences from the silence of the accused, the fact is brought to the minds of the jury that he may, if he will, testify in his own behalf. Another line of cases holds that, when the jury are told, in clear and emphatic terms, that no inference can be drawn against the accused because of his failure to testify in his own behalf, this dispels the effect of the allusion, and the error is cured.'' This case comes within the latter class.

Defendant asked, and the court refused, the following instructions:

''1. If the jury believe and find from the evidence that the defendant, at the time of the alleged shooting, applied and used toward the deceased a vulgar epithet, such as stated by the witness Howard, and that as a result of the provocation given by such epithet, the deceased attempted to draw a deadly weapon for the purpose of assaulting the defendant, or acted in a manner which justified the defendant in believing that the deceased was about to assault him with a deadly weapon, and that in resisting such assault or threatened assault upon himself, the defendant drew his weapon and shot the deceased, then, and under such circumstances, the defendant's right to defend himself against such assault or attempted assault, was only partially and not completely lost because of the fact that he gave the aforesaid provocation to the deceased by the aforesaid epithet; but the killing of the deceased by the defendant under such circumstances would constitute manslaughter in the fourth degree; and if the jury find

and believe the facts to be as aforesaid they will convict the defendant of manslaughter in the fourth degree, unless they acquit him on the ground of self-defense.

"2.   The jury is instructed that if they believe and find from the evidence that the defendant applied to the deceased a vulgar epithet, as stated by the witness Howard, or that he spoke to the deceased demanding to know if he was there looking for trouble, and that thereupon, without further provocation by the defendant, the deceased acted in a manner that caused the defendant to believe that the deceased was about to strike him or commit an assault upon him, and that as a result of such action on the part of the deceased, and in view of all the surroundings and circumstances given in evidence, the defendant, in hot blood, and passion caused by such conduct on the part of the deceased, drew his weapon and killed the deceased, then such killing would constitute manslaughter in the fourth degree and the jury will so find unless they acquit on the ground of self-defense."

With respect to the first of these instructions, we are of the opinion that there was no evidence upon which to base it.   According to the evidence, the defendant was either justified in killing the deceased upon the ground of self-defense, or was guilty of murder. There is nothing disclosed by the evidence to authorize the application of the doctrine of imperfect self-defense.   In the case of State v. Partlow, 90 Mo. 608, it is held that if the slayer provoked the combat or produced the occasion, in order to have a pretense for killing his adversary, or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat.   But if he had no felonious intent, intending, for instance, an ordinary battery merely, the final killing in self-defense would be manslaughter only, the distinction being be-

tween the right of perfect and the right of imperfect self-defense.

Now, there was no evidence of any circumstance connected with the homicide tending to show that defendant intended an ordinary battery merely. Upon the contrary, the evidence shows that the defendant used upon the deceased a pistol, a deadly weapon, in a difficulty which he himself provoked, which fact shows that the assault was made with a felonious intent, and this being so, there was no imperfect self-defense in the case.

The second instruction was properly refused because not warranted by the evidence and because it is not a correct presentation of the law of manslaughter in the fourth degree as frequently defined by this court. Thus, in State v. McKenzie, 177 Mo. l. c. 712, it is said: "Manslaughter in the fourth degree, under the statutes of this State, is the intentional killing of a human being in the heat of passion, on a reasonable provocation, without malice and without premeditation, and under circumstances which will not render the killing justifiable or excusable homicide, and as a general rule it takes an assault, with personal violence, to constitute such provocation." The same rule is announced in State v. Sumpter, 153 Mo. 436; State v. Meadows, 156 Mo. 110; State v. Brown, 64 Mo. 367; State v. Diller, 170 Mo. 1; State v. Ashcraft, 170 Mo. 409; State v. Kindred, 148 Mo. 270; State v. Gartrell, 171 Mo. 489; State v. Todd, 194 Mo. 377.

Immediately after the shooting in the saloon at the northeast corner of Twenty-second and Pine streets, the deceased ran out, and shortly thereafter entered Bumberry's saloon at 2214 Pine street, about the middle of the block between Twenty-second and Twenty-third streets. William McDonough and Edward P. Walsh, police officers, were standing, about 3 o'clock in the morning, at Twenty-third and Olive streets, a

block and a half from Bumberry's saloon, when a news-
boy told them that a man had been shot at Twenty-
second and Pine streets. They thereupon went down
to Bumberry's saloon where they found Sullivan with
his clothes unbuttoned and his shirt drawn up exposing
a bullet wound in his abdomen. He had entered Bum-
berry's saloon before the officers arrived, but it is not
known how much time elapsed between the shooting
and his entrance to said saloon.

Officer McDonough in reply to a question by the
circuit attorney, said:

"Well, the crowd started to gather in pretty thick,
you know; we had to push some of them back and get
them out in the street; so I asked him (Sullivan) if
they had a fight or how it come that he was shot—did
he shoot the other man? He says no. He stated he
didn't know what was the cause; there was no cause
that he knew of."

Counsel for the defendant objected because the
statement was not shown to be a dying declaration or
made under circumstances making it competent, and
for the reason that the statement was a conclusion;
and upon the court stating that, "It is already in," de-
fendant made a motion to strike the statement out on
the ground that it was irrelevant and incompetent, and
was not shown to be a dying declaration. Which mo-
tion of the defendant, the court overruled, saying: "I
think that comes within the rule as being a part of the
res gestae." Defendant saved exceptions to the ruling
of the court.

Officer Walsh was asked by the circuit attorney to
state what took place at Bumberry's saloon, and the of-
ficer was about to narrate the conversation between him
and Sullivan, the deceased, when the defendant objec-
ted, "on the ground that it is not proved to be a dying
declaration, or circumstances constituting an ante mor-
tem statement, and is not competent for any other rea-
son that I can conceive of. The same objection that I

urged this morning, and your honor permitted it, however, on the ground of its being a part of the *res gestae.*"

The court overruled the objection for the same reason as stated in the quotation, and the defendant saved his exceptions.

Thereupon, the circuit attorney attempted to show by the witness that Sullivan regarded his condition as hopeless; but the officer said that he had arrived at the saloon before his companion, Officer McDonough, and all that he heard Sullivan say was that "he was suffering, and did not want anybody to bother him." Thereupon, defendant again objected to the officer stating what Sullivan said, on the ground that it was not a dying declaration and not a part of the *res gestae,* and saved his exceptions to the ruling of the court.

William Bumberry testified that Sullivan walked into his saloon about two minutes, or it might have been five or ten minutes, before the officers came in, and that, after partially undressing himself, Sullivan lay down on a cot and was there when the officers had the aforesaid conversation with him. In addition to the lapse of time between Sullivan's entrance into the saloon and the coming of the officers was also the time that it required Sullivan to go to Bumberry's saloon from the saloon where he was shot.

It is manifest that this testimony was admitted upon the ground that the statements made by the deceased to, and the presence of, said witnesses constituted a part of the *res gestae,* that is, of what occurred at the time of the shooting of the deceased in Walsh's saloon.

In 24 Am. and Eng. Ency. Law (2 Ed.), 679, it is said: "The declarations of the deceased as to the cause and circumstances of the homicide will not be admissible if they are made at such a time subsequent to the occurrence of the main fact in issue and under such

circumstances as clearly render them mere narratives of a past event. And there has been a disposition on the part of some of the courts to lay down the strict rule that statements by the deceased after all action on the part of the accused, actual or constructive, has ceased through the completion of the principal act, or through determination of it by its prevention or its abandonment by the wrongdoer, do not form part of the *res gestae* and should be excluded. But according to the great weight of authority the true test of the competency of the evidence is not whether the declarations were made after the act of homicide was done, but they will be admissible as part of the *res gestae* if made after the lapse of so brief an interval and in such connection with the principal transaction as to form a legitimate part of it and to preclude the presumption that they are the result of premeditation and design. According to this rule no fixed measure of time or distance from the main occurrence can be established as a rule to determine what shall be part of the *res gestae*. Each case must necessarily depend on its own circumstances to determine whether the facts offered are really part of the same continuous transaction."

It is quite clear, we think, that the statements made by the deceased in Bumberry's saloon regarding the difficulty and after it occurred, did not form a legitimate part of it. The statements made by deceased were not contemporaneous with the transaction, and should not, therefore, be admitted as part of the *res gestae*. They were simply narrative in their character so far as they related to what had occurred at the time of the difficulty, and were nothing more than hearsay. The difficulty had occured some time before, and the transaction had been ended just as much as if the shot, which afterwards proved fatal, had killed the deceased instantly.

In the case of State v. Hendricks, 172 Mo. 654, the difficulty out of which the prosecution arose, and in

which Hipes was killed, occurred near the house of deceased. After being assaulted, the deceased struggled to his feet, walked on to his home, went in at the gate and walked up to the door, and either his wife opened it for him or he opened it himself. His assailant had then left the place of the difficulty. Upon entering his house the wife of deceased asked him "what was the matter." He replied, "They made their words good, that Jake Hendricks and Simon Hendricks had pounded him out there." Then Mrs. Hipes was permitted to tell what her husband narrated to her as to the details of the difficulty. The trial court admitted this testimony upon the theory that it was part of the *res gestae*. This court, speaking through Fox, J., said: "The statement of Mr. Hipes, after walking from where he was assaulted through the gate into the house, was purely narrative; in fact, the first thing he said, in answer to the question of his wife, 'What is the matter?' was in reference to a threat that had been made by the defendants, at least from the expression you would infer a threat, for he says, 'They have made their words good.' Then he proceeds to narrate minutely how he reached the place where the assault was made and all that was done by the defendants as well as himself. No one can read that statement and denominate it anything else than a narrative; it sounds just like the narrative of the difficulty months after it occurred. His statements must be taken as a whole; they cannot be separated, and say one part of it is a part of the *res gestae* and the other is not. These statements should have been excluded."

The rule announced in that case was followed in State v. Birks, 199 Mo. l. c. 273, 274.

The statements being, in our opinion, simply a narrative of a past occurrence, they should not have been admitted.

It is said for defendant that the court erred in ex-

cluding as incompetent uncommunicated threats, since the evidence was conflicting as to whether the deceased or the defendant was the aggressor; but we do not understand this to have been the ultimate ruling of the court in regard to uncommunicated threats. The record shows in the first place that the court ruled that evidence of communicated threats was admissible, but that evidence of uncommunicated threats by deceased would be excluded. But after counsel for the defendant stated that he did not expect to prove that the threats about to be testified to by the witness Brown had been communicated to the defendant, the circuit attorney withdrew his objection and the witness proceeded to testify to uncommunicated threats by deceased against the defendant. Moreover, the instructions embraced generally all threats, whether communicated or otherwise. There is, therefore, no merit in this contention. Defendant's plea in this case was that of self-defense, and as there was some doubt from the evidence as to who was the aggressor, uncommunicated threats made by the deceased against the defendant were admissible for the purpose of showing who was the probable aggressor. [State v. Sloan, 47 Mo. 610; State v. Elkins, 63 Mo. 165; State v. Bailey, 94 Mo. 316; State v. Harrod, 102 Mo. 609; State v. Spencer, 160 Mo. 118.]

It is insisted that the court erred in permitting witnesses to testify to statements made by deceased at the hospital after the shooting, though made in the presence of the defendant who was at the time under arrest. It has been ruled many times by this court that when a person is under arrest for a specific offense, he is not in a position to make any denial or statement with reference to what may be said in his presence regarding his connection with the offense, and his silence under such circumstances will not warrant any inference against him. [State v. Young, 99 Mo. 666, and authorities cited; State v. Foley, 144 Mo.

State v. Kelleher.

600.] It is unnecessary to decide whether this error, if it stood alone, would constitute ground for reversal, but we mention it in order that it may not be repeated upon another trial.

The rule as to the admissibility in evidence of dying declarations is that in order to be admissible such declarations must be made under a sense of impending dissolution, and after a hope of recovery has been entirely abandoned. The evidence shows that, from the time deceased was shot and came to a realization of his situation, he had practically abandoned all hope of recovery. At Bumberry's saloon, to which place he ran immediately after being shot, deceased requested that Bumberry send for a priest and a doctor. To John Howard, who was taken to see him, deceased said, "Johnny, I am a croppy, I am a dead one; there ain't nothing to it." When at the hospital, and his dying declaration was about to be taken, he said that it was all off with him. These remarks and statements, taken in connection with the attending circumstances, the condition of the wound and the deceased's state of mind from the first, show that the declaration was made under the impression of almost immediate dissolution.

The form of a dying declaration is immaterial, so that it clearly shows that it was made under a sense of impending dissolution. In State v. Nocton, 121 Mo. l. c. 550, SHERWOOD, J., speaking for the court, said: "A declaration may be received in evidence even without such formal statement. Thus, though 'it is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them in evidence, that they were made under a sense of impending death; but it is not necessary that they should be stated, at the time, to be so made. It is enough if it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved by

the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical of other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to, in order to ascertain the state of the declarant's mind. The length of time which elapsed between the declaration and the death of the declarant furnishes no rule for the admission or rejection of the evidence, though, in the absence of better testimony, it may serve as one of the exponents of the deceased's belief that his dissolution was, or was not, impending. It is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible.' [1 Greenleaf on Ev. (14 Ed.), sec. 158; 3 Russell on Crimes (9 Am. Ed.), 250; 6 Am. and Eng. Ency. of Law, 108, et seq., and cases cited.]''

Our conclusion is that the dying declaration was properly admitted in evidence, with the exception of the parts included in brackets, which were not admissible, because they do not relate to the killing nor the facts and circumstances attending it. [State v. Draper, 65 Mo. 335; State v. Bowles, 146 Mo. 6.]

No principle of law is better settled than that the reputation of a defendant in a criminal case cannot be attacked unless he first puts it in issue, or becomes a witness in his own behalf; and the court should not have permitted the State to ask defendant's witness, Kelley, although upon cross-examination, if he had not been sent to the penitentiary under a joint indictment against him and the defendant. As to Kelley, the cross-examination was well enough, but it was improper to include defendant in the inquiry, nor was it necessary in order to discredit Kelley. It was simply doing indirectly what the State could not legitimately do by direct testimony.

Our conclusion is that the judgment should be re-

versed and the cause remanded for further trial. It is so ordered.

All concur.