THE STATE OF NEVADA, Plaintiff and Respondent, *v.* JAMES WILLIAMS, Appellant and Defendant.

No. 3584

June 8, 1950.                                   219 P.2d 184.

*George F. Wright* and *F. Grant Sawyer,* both of Elko, for Appellant.

*Alan Bible,* Attorney General, *George P. Annand* and *Robert L. McDonald,* Deputy Attorneys General and *A. L. Puccinelli,* District Attorney of Elko County, Elko, for Respondent.

## OPINION

By the Court, BADT, J.:

Appellant was convicted of murder in the first degree and sentenced to death. He appeals from the judgment and from the order denying his motion for new trial. The appeal presents three points for our consideration. Using appellant's own language, they are as follows:

"1.   That the confession was taken after the defendant had been taken into custody and prior to the time that defendant was taken before a committing magistrate; that an undue delay in taking defendant before a committing magistrate renders the confession procured inadmissible;

"2.   That the District Judge erred in ruling that the confession was admissible over the objection of counsel in that the weight of the evidence indicated that the confession was obtained due to promises and inducements

from the District Attorney and from Under-Sheriff, Jess Harris.

"3. The verdict should be reduced to second degree murder"—the reason given for this assertion being that the evidence shows that appellant's state of intoxication was such that he was deprived of the power to form a design, to plan, deliberate upon and purpose the death of another; that the act was the result of impulse, not deliberation, so that appellant could not be guilty of murder in the first degree.

A consideration of the facts first becomes necessary.

The Southern Pacific Railroad and the Western Pacific Railroad run in a general easterly and westerly direction through the town of Deeth, in Elko County, Nevada, and at Deeth are separated by a matter of a quarter of a mile or more. Appellant Williams and his victim Abraham Gutierrez, called throughout the case by his nickname "Pardner," and hereinafter thus referred to, were both employed as laborers for the Southern Pacific, and each occupied living quarters furnished by the Southern Pacific. LeRoy Smith, also employed as a laborer by the Southern Pacific, lived in a boxcar which had been converted into a dwelling between one-quarter mile and one-half mile from the bunkhouse occupied by Williams. Williams and Smith were Negroes. Pardner was a Mexican, and lived with another Mexican referred to as "Preacher" or "The Preacher." Williams, Smith, Pardner and Preacher and other laborers had engaged in a drinking bout all of Saturday and Sunday, October 30 and 31, 1948, making numerous purchases of gallons and half-gallons of wine and pints of whiskey, and some beer from a local store. There is no question but that vast quantities of wine and whiskey and some beer were consumed by all of the parties during those two days.

On Saturday night the section foreman and the pumper left on a deer hunt, from which they did not return before Sunday night. Williams was left in charge of operating the pump and of generally looking after things, including, as the testimony is interpreted by appellant,

"watching that no one molested Mrs. Maud Svedin," the foreman's wife, who lived near the section houses. Appellant emphasizes the fact that Mrs. Svedin, though stating that Pardner had not made any improper advances to her, testified that when Williams took Pardner home Saturday night, Pardner said to her, "Mrs. Paul [Mrs. Paul Svedin], aren't you going to kiss me goodnight; aren't you going to kiss me goodbye"? She immediately sent him home but denied that she asked Williams to keep Pardner away from her or that she had ever discussed the matter with Bob Taelour (the pumper) or Buddy Seymour (a section worker). When Pardner was talking to Mrs. Svedin, he also asked Mrs. Svedin's young daughter to sit with him in the living room. He wanted to know her size so that he could order her a dress for a Christmas present. He had also at one time asked her to take a walk with him. We mention these things because of appellant's contention that under the influence of all of the wine and whiskey consumed by him that Saturday and Sunday his duty to protect Mrs. Svedin from Pardner assumed large and unnatural proportions.

The defendant, taking the stand on his own behalf testified in considerable detail, as to what had happened all of that Saturday and Sunday; as to where he went and what he did; as to the comings and goings of others; as to the numerous purchases of wine and whiskey and some beer; as to many conversations had; as to meetings in one bunkhouse or another; as to his frying some pork chops for Pardner. Then late Sunday night he lay down in his bunk to sleep. He then testified as follows:

"When they came to my house, well then Willie and Lonnie were there talking. Lonnie had come in and Lonnie was talking, and, they come to my house. And I said then I didn't want them in, and when I said I didn't want them in, they get a piece of iron and goes to knocking on the door; the Preacher does; and Pardner had a knife, made out of a case knife, a dirk. And when Preacher was knocking on the door, I go and open the

door then, and I told them, I says, you fellows go away; I don't want you fellows in my house. Well, they said, we all work for the railroad too, so we can go into any of these houses that we want to. So then I told them, yes, that is right, that you does work for the railroad, but the railroad gives me this house and they give you all your house over there, so, you can't come and take my house. They say, we come because we know that you have got something to drink; and I told them you can't come in my house. And then Preacher started in with that piece of pipe and I didn't have anything, so, I reaches down and picks up a big piece of coal and I throwed it at him and I told him to get out. And the Preacher walks away, and Pardner has this dirk in his hand. And the Preacher says: I'll fix him. And Pardner says: I'll kill him. And the Preacher goes to his house and Pardner starts going to his house and I break and ran * * Pardner had a dirk, made out of one of these files; no, it was one of those long table knives and he took a file and made a dirk out of it. It was really keen on the end and sharp on both sides * * *

"They says to me, what he says, well, you ought to kill him; why don't you kill him. Preacher says to Pardner. I mean Pardner says to Preacher, he says, why don't you kill him? and Preacher goes, starts in the house, and he says I will fix him and as he says that then I break and runs * * * I left while he was still in my apartment * * * Then, I goes through Mrs. Svedin's yard and keeps straight by the liquor store and goes right straight to LeRoy Smith. I don't have any idea how long it took to get from my bunkhouse over to Smitty's [LeRoy Smith's] house, but it would be very short time, I do know * * *

"I goes over to Smitty's house and when I get there, I knocks on the door and didn't anyone answer, and I knocks on the door again, and didn't anyone answer, and then I goes around to the other side and I knocks, and didn't anybody answer. And then I says, well, if he's been drinking all the time, something could have been

the matter with him, so I gets up to the window and looked in and I couldn't see or hear anybody, but there was a light in the cabin. So then I takes a box on the side of the wall and pushed it over by the window and breaks the glass and crawled in the window, I do. And there wasn't anybody in there. I get the rifle because I knows that the gun is just above the head; the head of the bed; it was held there with two nails, just for the rifle, to hang on. I get this rifle and then there was a whole box of shells there and I get some of those shells and I goes back over there; walking slowly back to my own place * * The clip holds six shells. I took that gun and took some shells and headed back to the bunkhouses.

"Well, before I got over there, when I goes by the liquor store, it was closed, so I got the liquor store man to open his store up; I went over to Mr. Johnson's house and got a half gallon of wine and I went to drinking it there * * * I was drinking wine just opposite his house there; right back of the store * * * So then I proceeded walking slowly down to my house. I goes to my house and I looks to see if Willie is there and he is still there; I did that because I was afraid that they might do something to Willie. I goes in and Willie is there laying on the bed asleep in his bed. And while Willie is laying there, I goes to drinking again. And then I goes and knocks on the Pardner's door * * * I knocked on Pardner's door and Pardner told me: You'd better not come in; if you come in, I'll kill you. So, I told him, well, you told me that already that you was going to kill me and you've already run me away from my house, so now it's either you're going to kill me or I'll kill you. You can come out now. And I started pushing the door a little in Pardner's house; it wasn't locked or anything. And when I came in he raised up on the bed. Then, that was when I shot him * * * He raised up in bed. He raised up while he was in bed. I was standing by the wall just as you come out in the kitchen going into the living room. I was just standing right against that wall,

right by the petition * * * I would say I shot something like about four or five times."

Asked by his counsel concerning the gun, he testified: "I don't know whether the clip was full; I don't really know. The gun has a little band on there and there is a little clip that you press and the clip will fall out; I looked and saw some shells in it and I pushed it back in."

He then testified of his return to his own house, drinking some more and taking a gallon and a half of wine over to Smith's house and tells of conversations with one or more of the other men in which he stated that he had killed Pardner and of the refusal of the others to believe him. He asked that the officers be sent for "'cause I didn't want to run off." He testified further as follows in response to questions put to him by his counsel:

"I am going to ask you again, Tiny [Williams], why you went to all that trouble to get the police?

"A. Well, the reason why, the reason I wanted to get the police was because what I had done, I figured I had a reason to do it, and I didn't want to run away and—after I had did it—and lay it to somebody else.

"Q. Did you figure, Tiny, that you were justified in doing what you did—that you had a reason for it? A. I did; for the reason what they had been doing to Mrs. Svedin.

"Q. Tiny, do you have any idea how much liquor you drank on Sunday? A. I really couldn't say because I drank so much I couldn't say—liquor and wine altogether."

On cross-examination the defendant went over much of the same ground and while consistently maintaining that he was very drunk, he had a rather clear recollection of everything that happened. After again testifying that he broke and ran when he saw that Pardner had a knife, he testified:

"Q. When you broke and ran were they coming after you? A. Pardner went to his house and Preacher was going in his house.

"Q. Precisely. You broke and ran when both men

were walking away from you; is that right? Is that correct?. A. That is correct.

"Q. And you went to Smitty's house? A. That is right.

"Q. How did you walk from your place to Smitty's house? A. I went through by Mrs. Svedin.

"Q. Well, now, in order to get to Mrs. Svedin, from your place, and then down to Smitty's, tell the Court and Jury how you would have to go? A. There is a little trail that goes through there. The trail goes right through by Mrs. Svedin, right up to—right up the alley to the liquor store, by the liquor store straight on through.

"Q. Did you walk along that trail that night? A. Yes; its a trail that goes up through in there.

"Q. So now, you testify that you walked straight across; is that correct? A. You can't walk straight across; you get to this alley and you go up the alley to the liquor store and straight from there."

In explaining why he broke and ran while Pardner and Preacher had turned their backs and were walking away from him, he testified: "Well, the Preacher was supposed to be going and getting a gun too. That is what he said; that he was going to get something and fix me * * * And Pardner says—kill him * * * and I broke and ran because I knowed—he always said he had a gun."

The cross-examination further emphasized the fact of his breaking into Smith's house to get the gun, of his ascertaining that the gun was loaded by removing and replacing the clip of shells, of his return to the store, getting the proprietor up and buying more wine. "Well, afterwards I thought of Willie up there in my house and I was wondering if they had done anything to him; hurt him; so, I wanted to go back and see if he was all right." He then went to his own house, the lights were on, Willie was asleep, Williams walked across the yard to Pardner's house. He again recounted the shooting

substantially as he had testified on direct examination. As to Pardner's position, he testified: "He was laying down and raised up when I came in."

It is unnecessary to set forth the confession signed by appellant. In substance the facts stated therein are the same as the facts testified to by the appellant on the witness stand. The transcript comprising several hundred pages contains a great deal more testimony not only by the defendant but by many other witnesses for both the state and the defendant. For the purpose of considering the points raised on this appeal we find it unnecessary to make further reference thereto.

■ With reference to appellant's assertion that the record shows that he was not taken before a committing magistrate until December 14, 1948, forty-three days after he was taken into custody on November 1, 1948, the respondent's brief asserts the fact to be in accordance with the following chronology of events. October 31, 1948, deceased shot and killed by defendant; November 1, defendant arrested; November 3 (after holding of coroner's inquest) complaint filed charging defendant with first-degree murder; November 3, defendant brought before the justice of the peace of Elko township (Elko is some 35 miles west of Deeth), advised of the charge contained in the complaint, and preliminary hearing set for November 9, 1948, thereafter continued to November 10, 1948; November 3, 1948, at approximately 5:30 p. m., several hours after he had been brought before the committing magistrate, confession signed; November 10, preliminary hearing completed and defendant held to answer; November 23, new complaint filed, followed by preliminary hearing (in which appellant was again held to answer and upon which he was arraigned and tried), which filing of such new complaint was occasioned by the ruling of the district court by reason of appellant's challenge, through his attorneys, of the legality of the original information. Under this chronology of events respondent asserts that appellant was

brought before a committing magistrate within forty-eight hours rather than after a delay of forty-three days as asserted by appellant, and that appellant was as a matter of fact brought before a committing magistrate before signing his confession. While counsel for appellant state in their reply brief that they "feel constrained to stay within the purview of this record as presented before this court [and not] to impose upon this court by stating alleged facts or arguments which are not a part of, and do not appear as any proceeding in this matter," they do not controvert any of the statements in respondent's brief with reference to such first proceedings.

The only place in the record before us showing that appellant was taken before a committing magistrate on December 14, 1948, forty-three days after he was taken into custody on November 1, appears in the trial court's "Judgment and Sentence," filed April 18, 1948, and which likewise appears verbatim in the minutes of the court of that date, in the preliminary or introductory recitals whereof the court said in part: "James Williams, the Court informs you that on the 23rd day of November, 1948, the district attorney of Elko County, Nevada, filed a complaint against you in the name of James Williams in the justice court, Elko township, in the County of Elko, State of Nevada, and that thereafter and on the 14th day of December your preliminary hearing was had upon said charge of murder in the first degree in said justice court * * *" For the purpose of the learned trial judge's making of the record there was no occasion to mention the fact that this was a new or second complaint or that the defendant had successfully challenged the legality of an earlier information based upon an earlier complaint under which the defendant had on a prior date been brought before the committing magistrate. But more significant perhaps is the fact that when the confession was offered in evidence the only objection made by the defendant was that his confession had been signed solely by reason of the district attorney's promise that if the defendant would sign the confession,

he would not "have to do over two or three years" at the penitentiary, and the undersheriff's assurance that the defendant could rely upon the promise of the district attorney. After the state had had the written confession marked for identification and identified by the undersheriff as the instrument read to and signed by the defendant and before it was introduced in evidence, defendant's counsel stated: "If the Court please, I presume this is no doubt an attempt to introduce into evidence some document purportedly signed by Mr. Williams. If this involves a confession, I would like to ask, and I think it is only fair, that the jury be excused *and the matter of its admissibility be gone into by the court* before we proceed further." (Italics supplied.) The state made no objection to such request and the court excused the jury. The undersheriff then testified briefly to the voluntary signing of the confession on November 3, 1948, following his arrest on November 1. The deputy sheriff was cross-examined at some length, and reiterated that he had brought Williams to the district attorney at the former's request, that he signed the confession voluntarily after being advised that he did not have to sign it and that it could be used against him, and that no promises of any kind had been made. The defendant then took the stand and testified that he had signed it because of the assurances given him: "I signed it because of what you told me * * * I only signed that on account of what you say * * * I only signed this because of what you say you would do if I sign it." In ruling on an objection to certain cross-examination at this point, the court stated to the district attorney: "* * * *the question is* whether or not he was offered an inducement. I think you should confine your examination to that." The court then questioned the defendant and the defendant repeated to the court: "Well, he told me, he says, if you will tell me what happened, I will give you my promise, this word; he said that if you will tell me, you won't go to the penitentiary for a long time; I will see that you don't do over two or three

years." The court then of its own motion called the district attorney's secretary and examined her concerning her taking down in shorthand the statements made by the defendant. Neither party had theretofore called the secretary. After she was excused the court announced that it would take the noon recess till 1: 45 p. m., and stated: "At that time the court will rule on this matter." On reconvening, the court ordered the record to show the absence of the jury and the fact that it had been excused for the purpose of taking evidence "on the admissibility of an alleged confession," and stated: "This is the time appointed for the ruling upon the admissibility of the said confession." It then ruled that the confession was admissible. The jury was recalled, and the undersheriff and the defendant were both examined and cross-examined before the jury and testified substantially as they had in the jury's absence. Before pronouncing sentence upon the jury's verdict of guilty of murder of the first degree and fixing the death penalty, defendant moved for a new trial, which motion was denied by the court. The point now under discussion was not raised in the motion for new trial, in the objection to the admission of the confession or at any other time prior to such assignment, as error, in appellant's opening brief.

■ It will thus appear that at no point in the proceedings in the court below did the defendant ever object to the introduction of the confession upon the ground that it had been given before defendant was taken before a committing magistrate. Had objection been made on such ground, or had such point been raised on the motion for new trial, not only would the trial court have had an opportunity to pass on the same, but the facts concerning the earlier proceedings would have been made a part of the record and would be before us on this appeal. In addition, as we have noted above, virtually everything contained in the confession was testified to by the defendant when he voluntarily took the stand in his own behalf. The defendant's challenge of the absence of these earlier

proceedings from the record, while refusing to controvert the recital of such earlier proceedings as made in the respondent's brief and in its oral argument to this court, must, under the circumstances, be determined to be without merit.

■ In support of the contention that the confession was inadmissible because obtained after defendant was taken into custody and prior to the time that he was taken before a committing magistrate, appellant cites sec. 10744, N.C.L.1929, reading: "The defendant must, in all cases, be taken before the magistrate without unnecessary delay." He then refers to Upshaw v. U. S., 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100. Respondent concedes that under the Upshaw case and under its reference to McNabb v. U. S., 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, therein referred to, the federal rule precludes the admission of the confession when obtained before the defendant was taken before a magistrate. However in the recent case of State v. Boudreau, 67 Nev. 36, 214 P.2d 135, this court held, following the majority rule in the state courts, that such situation does not of itself render the confession inadmissible. We adhere to the ruling there made, and hold the point to be without merit.

■ 2. As to appellant's contention that the confession was inadmissible because made only as the result of the district attorney's alleged promises, we may say simply that appellant's testimony in this respect was flatly contradicted by Undersheriff Harris, who testified that no promises were made and that he had brought appellant to the district attorney's office at appellant's request. Both the district judge in the first place, and the jury in the second, evidently disbelieved the testimony of appellant and believed that of the undersheriff. This they had a right to do. The learned district judge, with commendable care and caution, not only questioned the witnesses himself, but insisted on calling the district attorney's secretary for examination. It is not our province, on this appeal, to pass upon the credibility of these

respective witnesses. We must hold that the point is without merit.

■ 3. We are satisfied that, despite the quantities of wine, whiskey and beer consumed by appellant, there was ample evidence to justify the jury's finding of such wilfulness, deliberation and premeditation as were necessary to support a verdict of first-degree murder. State v. Jukich, 49 Nev. 217, 242 P.. 590. Pardner and Preacher, after being refused admittance to appellant's cabin, left and were returning to their own cabin, leaving appellant at home, behind locked doors, with Willie and Lonnie. Appellant left, walked a distance of between a quarter and a half mile to Smith's boxcar, found both doors locked, broke in through a window, took Smith's gun from its rack, removed the clip to ascertain that it was loaded, replaced the clip, walked slowly back, got the storekeeper up to get another bottle of wine, drank some of the wine, went back to his own cabin, found that Willie was there safely sleeping, then went across the street to Pardner's cabin, pushed open the door, went through the kitchen to the opening to the bedroom, and shot Pardner in his bed, not once, but four or five times.

By instruction No. 23, the court instructed the jury as follows: "The jury is instructed that, while intoxication is no defense to the committing of a crime, a person may be under the influence of intoxicating liquor to the extent necessary to render him incapable of committing the crime of murder in the first degree and if you find from the evidence that defendant had consumed a quantity of liquor sufficient to render him incapable of wilfulness, deliberation or premeditation, you cannot reach a verdict of first degree murder."

In instruction No. 24, after covering the necessity of proof beyond a reasonable doubt that the killing was deliberate and premeditated, the jury was instructed:

"In considering whether the killing was deliberate and premeditated, you should consider the evidence, if any, of drunkenness. If the defendant was drunk at the time of the alleged killing and was too much intoxicated

to form such a deliberate and premeditated purpose, then he cannot be found guilty of murder in the first degree.

"It is true that drunkenness is no excuse for the commission of an offense, but nevertheless, the jury must consider any evidence of drunkenness and determine whether it was sufficient to so cloud the mind of the defendant as to interfere with the formation of a deliberate and premeditated purpose to kill.

"If, after considering all of the evidence, there is reasonable doubt in your mind as to the existence on the part of the defendant of such a deliberate, premeditated purpose, you cannot find the defendant guilty of murder in the first degree."

Appellant assigns no error in any of the instructions given, or in the rejection of any requested instructions. Other than the admission of the confession, no error is claimed in the admission or rejection of any of the evidence, or in the conduct or argument of the district attorney, or in the consideration of the case by the jury. In addition to the briefs and oral argument, we have carefully read and considered the entire transcript of the evidence and are satisfied that the jury returned a just verdict.

The judgment and the order denying defendant's motion for a new trial are affirmed, the petition for modification of the judgment by reducing the degree of the crime is denied, and the district court is directed to make the proper order for the carrying into effect, by the warden of the state prison, of the judgment rendered.

HORSEY, C. J., and EATHER, J., concur.