STATE of Missouri, Respondent,

v.

Richard BROWN, Appellant.

No. 51452.

Supreme Court of Missouri,
Division No. 1.

June 13, 1966.

Motion for Rehearing or to Transfer to Court
En Banc Denied July 11, 1966.

Norman H. Anderson, Atty. Gen., Jefferson City, Stanley D. Rostov, Special Asst. Atty. Gen., Kansas City, for respondent.

John D. Chancellor, St. Louis, for appellant.

HOLMAN, Presiding Judge.

Charged by indictment with murder in the first degree, the defendant, Richard Brown, was found guilty of that offense and his punishment was fixed by the jury at life imprisonment. See §§ 559.010 and 559.030, RSMo 1959, V.A.M.S. Defendant has appealed.

Defendant was jointly indicted with Courtney Lorenzo Beasley, Archie B. Brown (no relative of defendant), and Jimmie Sharp, but prior to trial defendant was granted a severance. Defendant and the others named were charged with killing Vernon Coleman on May 11, 1964, by beating and kicking deceased and striking him with a cluster of brick, held together by mortar, which weighed 90 pounds. Coleman, a 35-year-old Negro (all parties involved apparently were Negroes), lived in a shed on an alley at the rear of 4311 Garfield in St. Louis, Missouri. Coleman followed the practice of purchasing intoxicating liquor for the teen-agers in the neighborhood, and his compensation each time was a drink out of the bottle purchased. On the dates in question defendant was 15 years old. All of the young people mentioned in this factual statement were juveniles except Beasley who was 17. At about 5 p. m. on May 11, Coleman bought some wine for defendant and Beasley. That evening Beasley, Tommy Brown (brother of defendant), Jimmie Sharp, Harold Frazier, Betty McAlpine, and Myra Hair gathered at defendant's home where they danced and drank wine. They left about 9:30 and the boys congregated on Pendleton Avenue across the street from the alley leading to Coleman's shack. The girls had gone to Betty's home where they were instructed by Betty's aunt to go out and get some food. Apparently their route took them by the place where the boys had gathered. At about that same time the boys decided to go to Coleman's shack, and the girls stood at the entrance of the alley and watched the proceedings. The boys entered the shed and Beasley asked Coleman for some wine. When he got none he commenced striking Coleman. After a time Coleman ran out of the building into the alley where one of the boys grabbed him and he fell to the ground. At that time all the boys gathered around Coleman and kicked him and hit him with sticks and bricks. Defendant picked up the large block of bricks and dropped it, according to the testimony, either on Coleman's chest or left shoulder. At about that point all of the boys, except Beasley, ran from the alley and were joined by the girls in leaving the immediate vicinity of the Coleman shack. The evidence does not disclose just when Beasley left or where he went. Some of the boys went to their homes, but defendant and Frazier spent the night in the apartment of Betty McAlpine's aunt, Mrs. Yvonne Collins, located in the same house in which Betty and her family lived.

At 12:58 a. m. May 12, a call was received by the police and upon going to the area in question they found Coleman lying on the ground unconscious. They immediately took him to the hospital where he was pronounced dead. An autopsy was performed which disclosed that Coleman died as the result of a traumatic fracture of the skull in the right temporal region and resulting cranial hemorrhage. In response to a hypothetical question a physician testified that in his opinion death resulted from the beating of Coleman in the manner hereinabove described. The young people above mentioned were arrested within a few hours following the finding of deceased's body, although defendant was probably not arrested until about 7 o'clock the following morning. He and the others were questioned at the homicide division of Central Police Station and defendant signed a written statement admitting his participation in the assault. A motion to suppress the statement was overruled prior to trial and it was admitted in evidence over the objection of defendant.

As will hereinafter appear, it is important that we set out the substance of the confession signed by defendant and also a summary of his testimony in his own behalf. The confession was in question and answer form, but we will state it in the narrative in order to save space. Therein, after giving information concerning his age, address, parents, etc., defendant stated that at about 10 o'clock on the evening of May 11, Beasley and Archie B. suggested that the group of eight or nine boys go to the shed of Ace Coleman, saying, "Let's go mess with Ace," which he thought meant to go tease him about drinking wine; that when they got there Beasley went in the shed and said to Ace, "Give me some wine," and Ace said, "I don't have none," and Beasley hit him in his face with his fist; that Ace sneaked out some way and then Jimmie hit him and knocked him down, and all eight of the boys were around him "kicking on him and everything"; that he kicked him about five times with the desert boots he had on, and

some of the boys struck him with sticks; that he then picked up the cluster of bricks, lifted it a little over a foot, and dropped it on Coleman's left shoulder; that during all of the time Coleman was asking what he had done and saying that they shouldn't be bothering him; that after he had dropped the bricks somebody said, "He's dead," and that he said, "No, he ain't, man, because he is still breathing"; that Coleman was still trying to get up and said something about calling the police and then everybody ran.

On direct examination defendant testified that at about five o'clock p. m. on May 11, Coleman bought some wine for him and Beasley; that Coleman also put a pill in a cigarette and gave it to him which made him dizzy when he smoked it; that later that evening, at Beasley's suggestion, he, Beasley, Jimmie Sharp, Harold Frazier, and Archie Brown went up to Ace Coleman's shed; that Beasley went in the shed and struck a match and called Coleman's name, and as Coleman raised up out of bed Beasley started throwing at him and he hit him; that Coleman then ran out of the shed and someone knocked him down and "he fell beside me and grabbed my leg and I started kicking him. I then saw the cluster of bricks and I picked it up and dropped it on his shoulder to make him let go of my leg. He let my leg go and Harold Frazier said the man was dead. I got down on my knee and listened to his heart and I said he wasn't dead, and I then left the alley. As I left I looked back and he was trying to get up and was cursing." He further stated that when the police officers and others questioned him the following morning he answered every question they asked; that he had an eighth grade education.

Defendant's first point is that the court erred in overruling his motion to suppress the confession and in admitting said statement in evidence at the trial. At the hearing of his motion to suppress defendant presented two witnesses. He first called Quentin Gansloser, the first assistant circuit attorney, who stated that he arrived at the homicide division of Central Police Head-

quarters at about 9 a. m. on May 12 and proceeded to take statements from a group of boys; that he did not recall contacting the juvenile court judge before taking the statements; that prior to questioning defendant he did not advise him of his right to consult an attorney, nor advise him of his right to contact his mother, but did ascertain that no one had threatened defendant or promised him anything; that he advised him that any statement he signed could be used against him in court and that he did not have to give one except of his own free will.

The other witness, John Brooks, testified that he was a deputy juvenile officer and that he had been informed, about 10 a. m. on May 12, that defendant was in the custody of the homicide division; that he immediately went to homicide and saw defendant and some other boys in a room with Officer Webb and Mr. Gansloser; that he then identified himself to Mr. Gansloser as a juvenile officer and asked if he could speak with defendant; that Gansloser replied, "You can speak with him after a while, later"; that he then went into another room and waited, and later talked with two of the boys, but defendant had not been sent in at the time he left at 12:30 p. m.; that he saw defendant that afternoon in the detention office of juvenile court.

The reasons advanced by defendant in support of his contention that the statement should have been excluded are summarized in the following quotation from his argument: "It must be clarified at the outset that no contention is here made that appellant suffered physical or psychological coercion or any threats or promises. Rather, the contention is that the confession was not voluntary for the purpose of due process because: Appellant, a fifteen year old Negro boy with an eighth grade education was not given the advice of his mother, an attorney or an adult friend, he was not taken before the juvenile court as required by law and an officer of the juvenile court * * * was restrained from talking with

defendant until after he signed a confession in absolute defiance of * * * the laws of this state; and, further, appellant was not advised of his right * * * to remain silent and make no statement at all." He relies mainly upon the cases of Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325, and Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224.

We have decided that we need not determine the contention as to whether the court erred in admitting the confession. This for the reason that, assuming arguendo (but not deciding) that the statement should have been excluded, its admission could not have been prejudicial to defendant because he subsequently testified to every material fact contained therein. "[W]hen the truth of a confession is established by the very person who made it under such solemn circumstances as on oath in open court, he may not be permitted to claim error because of the use of the confession on the ground it was involuntary." State v. Ussery, 357 Mo. 414, 208 S.W.2d 245, 247. Our conclusion is also supported by the following cases: State v. Forbus, Mo. Sup., 332 S.W.2d 931 [3]; State v. Laspy, Mo.Sup., 323 S.W.2d 713 [8]; State v. Bray, Mo.App., 278 S.W.2d 49 [3]; State v. Smith, 357 Mo. 467, 209 S.W.2d 138 [3]; State v. Smith, 354 Mo. 1088, 193 S.W. 2d 499 [5]; State v. Marlin, Mo.Sup., 177 S.W.2d 485 [10]; State v. Bagby, 338 Mo. 951, 93 S.W.2d 241 [16]; State v. Ward, 337 Mo. 425, 85 S.W.2d 1 [13]; State v. Park, 322 Mo. 69, 16 S.W.2d 30 [3]; Robinson v. United States, 61 App.D.C. 370, 63 F.2d 147 [2]; People v. Reid, 233 Cal.App. 2d 163, 43 Cal.Rptr. 379 [2]; Hubbard v. State, 35 Ala.App. 211, 45 So.2d 795 [8]; TVRZ v. State, 154 Neb. 641, 48 N.W.2d 761 [8]; Walker v. Maxwell, 1 Ohio St.2d 136, 205 N.E.2d 394 [1]; State v. Jones, 52 N.M. 118, 192 P.2d 559 [4]; and State v. Williams, 67 Nev. 373, 219 P.2d 184 [1].

We accordingly rule defendant's first point adversely to him.

Defendant's next contention is that the court erred in permitting the assistant circuit attorney, on voir dire examination, to advise the prospective jurors that the juvenile court had certified defendant for trial as an adult. That was done preliminarily to asking the panel whether any of them felt "he could not convict this defendant solely because he is of the age of sixteen." Outside the hearing of the panel defendant objected on the ground that the statement was equivalent to showing "a prior conviction in this case and on the issues of this case, and as to the seriousness of this case by previous judicial authority."

■ Section 211.071, RSMo 1959, V.A. M.S., provides, in part, that "In the discretion of the judge of the juvenile court, when any petition under sections 211.011 to 211.-431 alleges that a child of the age of fourteen years or older has committed an offense which would be a felony if committed by an adult * * * the petition may be dismissed and such child or minor may be prosecuted under the general law whenever the judge * * * finds that such child or minor is not a proper subject to be dealt with under the provisions of sections 211.-011 to 211.431." While it may not have been necessary for the circuit attorney to advise the panel concerning the action of the juvenile court in order to propound the question he did, we do not think such was prejudicial to the defendant. We do not agree that the order of the juvenile court indicated a finding of guilt. Certainly we think that the average juror would not have any definite idea concerning the meaning of such an order. It is our view that in making such an order the juvenile judge would give primary consideration to the nature of the charge, the background and record of the child, and his physical and mental maturity. We accordingly rule that the statement of the circuit attorney did not constitute reversible error.

Betty McAlpine testified that after the assault had been in progress for a time Beasley walked out of the alley and showed her that his finger had been cut; that he then went back up the alley. Defendant made an offer to prove by the witness that Beasley had told her "that the old man in the shed had cut him." The court sustained an objection to the effect that the statement was hearsay. Defendant contends that the court erred because the proffered testimony was admissible as a part of the res gestae.

■ We doubt that the statement was admissible because it apparently occurred some distance from the place of the actual assault, was not in the presence of the defendant, and the element of spontaneity appears to have been lacking. However, even if we assume that it was admissible, we have the view that the exclusion of the statement was not prejudicial error because that evidence would not have been sufficient, when considered with the other evidence, to have supported the submission of defendant's purported defense. As we understand defendant's theory of defense, it was that Coleman had not been fatally injured when defendant and the others abandoned the assault and that Beasley stayed behind and thereafter assaulted Coleman in such a manner as to cause the skull fracture from which he died. Defendant says that proof that Coleman cut Beasley's finger furnished a motive for Beasley to return to the scene of the assault and to inflict the mortal wound after the others had left. The difficulty with defendant's contention is that there was no substantial evidence from which a jury could reasonably have found that Beasley remained at the scene and inflicted the skull fracture after the others had left. That being true it was not prejudicial error to exclude the proffered statement.

It is also defendant's contention that the court erred in refusing to give Instruction "A", offered by him, which submitted his theory of defense. It reads as follows: "If you find and believe from the evidence that on May 11, 1964, between the hours of 10 and 11 p.m., the defendant Richard Brown, acting in concert with one or more

other boys, did make an assault upon one Vernon Coleman, commonly known and referred to in the evidence as 'Ace' Coleman, and if you further find and believe that the defendant, Richard Brown, and one or more of the other boys abandoned and discontinued the aforesaid assault, and left the area prior to the fatal wounding of the said 'Ace' Coleman, if any you find, and if you further find and believe from the evidence that after this assault was abandoned and discontinued by the defendant, Richard Brown, that Courtney Beasley or some other party or parties unknown returned or appeared at the scene and continued or renewed the assault or effected a new assault on the deceased, without the concert, encouragement or assistance of the defendant Richard Brown, if you so find, and if you further find that death was caused by this later assault upon the deceased, 'Ace' Coleman, by Courtney Beasley or some other party or parties unknown without the concert, encouragement or assistance of the defendant, Richard Brown, then you will find the defendant Richard Brown not guilty."

We think the court properly refused the instruction because, as we have indicated in our discussion of the preceding point, it is not supported by the evidence. There was no evidence that Beasley or anyone else assaulted Coleman after defendant left the scene. Moreover, defendant's own testimony indicated that Coleman was very badly wounded before he and the other boys left the alley. He stated that one of the boys said Coleman was dead, but that he knelt down and listened to his heart in order to determine that he was still alive. Defendant points to the rule that a defendant is entitled to a converse instruction if he requests it and says that "A" was a converse instruction. While a defendant is ordinarily entitled to have a correct converse instruction given if he submits one it is obvious that "A" was not a true converse. In addition to requiring a finding that defendant and those with whom he was acting in concert abandoned the assault before the fatal wound was inflicted, it also required a finding that Beasley, or some unknown party, thereafter inflicted the wound which caused death, and, as we have said, there was no evidence to support such a submission.

In support of his contention defendant has cited State v. Majors, Mo.Sup., 237 S.W. 486, in which the refusal of an instruction somewhat similar to "A" was held to be reversible error. That case has no application here, however, because in Majors there was evidence which would reasonably have supported a finding that the fatal shot was fired by one other than defendant or those with whom he was acting in concert. We rule that the court did not err in refusing Instruction "A".

In connection with his complaint concerning the refusal of Instruction "A" defendant also contends that the court erred in giving Instructions 1, 2, 3, and 4. The first three instructions mentioned, respectively submitted, in usual form, murder in the first degree, second degree, and manslaughter. Number 4 related to concert of action and appears to be in the form generally used for that purpose. Defendant does not contend that these instructions are not in proper form. As we understand his contention it is that, since the instructions referred to certain defenses which were not applicable (such as excusable and justifiable homicide), and since the court did not give Instruction "A" submitting his theory of defense, the effect was to deprive him of any defense whatever. We see no merit in that contention. The instructions given were correct and the court properly refused Instruction "A". It is therefore apparent that no error occurred in the giving and refusal of those instructions.

Mr. Gansloser took the witness stand in order to identify defendant's confession. On cross-examination defendant brought out the fact that the witness also took

statements from the others who participated in the assault. He attempted to prove that each of these persons stated that the cluster of bricks fell on Coleman's chest. The court sustained an objection to the effect that the statements sought were hearsay. Defendant contends that the court erred in its ruling because the statements were admissible as declarations against interest. He relies on Sutter v. Easterly, 354 Mo. 282, 189 S.W.2d 284, 162 A.L.R. 437, wherein an incriminating affidavit was held to have been admissible where the affiant refused to testify on the ground he might incriminate himself.

■ We have concluded that the court did not err in excluding the proffered testimony. One reason is that defendant did not comply with the requirement of the Easterly case by showing that the declarants were dead, insane, or otherwise unavailable for testimony. They were not shown to be out of the state and were not placed on the stand and required to either testify or claim their constitutional right against self-incrimination. In that connection we note that one of the boys did testify for the State.

We also observe that the statements in question would have been merely cumulative. There was no direct evidence in the case to the effect that the cluster of bricks struck Coleman's head. The only testimony was that it struck his shoulder and chest. The proffered declarations would have been additional evidence to the same effect.

■ In addition to the foregoing we note that the rule generally applied in criminal cases is that the hearsay rule excludes from evidence extrajudicial declarations of the commission of criminal acts. See Anno. 162 A.L.R. 446, 450. For all the reasons mentioned we rule this contention against defendant.

In his motion for new trial defendant alleged that a newspaper containing an article concerning this case was found in the jury room after the jury had completed its deliberations. Upon the hearing of the motion defendant presented the testimony of a juror who said he had purchased the paper and had taken it to the jury room. He denied, however, that he had seen the article. Another juror was produced who stated that he saw the paper in question but only read the sport section. There was no evidence that any juror saw the article. Defendant contends that the court erred in failing to grant a new trial because the article was available to the jury and it is likely that some of the jurors read it.

■ We do not agree with defendant's contention. The fact that some juror *might* have seen the article would not warrant the granting of a new trial. Since there was no evidence that any juror actually saw the article we rule that the court properly denied a new trial on that assignment. State v. Darrow, Mo.Sup., 104 S.W. 2d 249 [8]; State v. McGee, 336 Mo. 1082, 83 S.W.2d 98 [13]; Mayor, etc. of City of Liberty v. Boggess, Mo.Sup., 321 S.W. 2d 677 [12].

An examination of the record as required by S.Ct.Rule 28.02, V.A.M.R., discloses no error.

The judgment is affirmed.

All concur.