THE STATE v. LONNIE TAYLOR, *alias* (LEE GUY) TAYLOR, Appellant.—
51 S. W. (2d) 1003.

Division Two, July 1, 1932.

*Sidney R. Redmond* and *Henry D. Espy* for appellant.

1038

*Stratton Shartel*, Attorney-General, and *Don Purteet*, Assistant Attorney-General, for respondent; *Harry O. Smith* and *Peter H. Huck* of counsel. .

WESTHUES, C.—The defendant, Lonnie Taylor, Columbus Jennings and Vera Fox, or Rogers, all negroes, were charged, by an information filed in the Circuit Court of Ste. Genevieve County, Missouri, with the crime of murder in the first degree, in that they shot and killed Paul Ritter, a white man, on the 12th day of October, 1930. Defendant applied for a change of venue from the Twenty-seventh Judicial Circuit, which consists of the counties of Bollinger, Madison, Perry, St. Francois and Ste. Genevieve. The application was overruled, but the court of its own motion granted the defendant a change of venue from the county and transferred the case to St. Francois County, within the circuit. Defendant, Lonnie Taylor, asked for and was granted a severance. At the trial he was found guilty of murder in the first degree and the jury assessed the death penalty. From a sentence, imposed in accordance with the verdict, defendant appealed.

The evidence, adduced by the State, discloses the following facts: Paul Ritter and Harry Panchot, on October 12, 1930, about midnight, were riding in an automobile in Ste. Genevieve, Missouri. When they neared the railroad depot the defendant and Columbus Jennings and Vera Rogers stopped them and asked to be taken to Little Rock Landing, which is located several miles from Ste. Genevieve on the Mississippi River. Ritter and Panchot agreed to take

1042

the three to the landing for one dollar and fifty cents ($1.50). Thereupon the parties proceeded on their journey. When they passed under a railroad trestle one of the negroes, the defendant in this case, at the point of a revolver, ordered Ritter and Panchot to stop the car and get out. Defendant stepped out of the car and remained with Panchot, while Jennings followed Ritter. Jennings took Ritter's watch and money from him and commenced beating him over the head with a pistol. While this was going on Ritter heard a shot on the opposite side of the car and saw Panchot fall. Defendant then came to where Ritter and Jennings were and said to Ritter "You are a tough S— of a B—," and then shot him. The three negroes took the bodies to the Mississippi River and threw them in the water. Panchot was dead. Ritter attempted to get out of the water but the negroes threw rocks, hitting him on the head, causing him to become unconscious. After a short interval he called for help. The water at this place was not very deep. Witness Duggan, who was guarding a boat that had been tied up for the night, at a point a short distance from the railroad trestle, testified that he heard several shots near the trestle and shortly thereafter heard a noise near the water's edge. Within about thirty minutes he heard moans and cries for help. Responding to these calls he found Ritter struggling to get out of the water, and in answer to questions as to what had happened he replied: "Two *niggers* shot me." "They held me up." "They've *throwed* rocks on me." Duggan noticed many cuts upon the head of Ritter. Panchot's body was found in the water. Ritter was taken to St. Anthony's Hospital, at St. Louis, where he died October 14, 1930. An examination disclosed that he was suffering from a bullet wound. The bullet had lodged near the spinal column, causing him to be paralyzed from hips down. Ritter was also suffering from numerous bruises and lacerations about the head. Part of the skull was pushed downward and a piece of rock had penetrated and was found in his brain. Ritter was advised he could not recover and after stating, he believed he was going to die, made a statement of what had happened. These statements of the affair, by Ritter, as to what occurred at the time of the killing, except for the surrounding circumstances and statements made by the defendant, after his arrest, constituted the major portion of the State's testimony. The defendant's statements, as testified to by the sheriff of the county, coincide with the facts as related by Ritter in his statements.

The defendant's version of the shooting, at the trial, was substantially as follows: Defendant and Columbus Jennings and Vera Rogers were attending a negro party or dance. They desired to go to another party at Little Rock Landing and made some inquiry as to how to get there. Someone told them that the two deceased, Ritter

and Panchot, would take them to the landing for one dollar and fifty cents ($1.50). Thereupon they proceeded to the landing in deceased's car. Ritter, the driver, and Panchot occupied the front seat, while the three negroes occupied the rear seat. When the parties neared the trestle, Ritter made improper advances toward Vera Rogers, whereupon defendant, Taylor, complained to Ritter and advised him that he should not make such advances. Defendant thereby angered Ritter and a quarrel ensued. Finally the car was stopped near the trestle and Ritter turned and struck defendant and attempted to strike a second time, but defendant warded off the blow and all parties left the car. Ritter began striking defendant, when Vera Rogers called to defendant that Panchot was coming with a gun to shoot him. Defendant looked and saw Panchot advancing with what he thought was a revolver. Defendant drew his pistol, fired and Panchot fell to the ground. Ritter thereupon attempted to take the revolver from defendant and being larger and stronger was about to accomplish his purpose, when, fearing that Ritter would kill him with his own gun, defendant testified, he pulled the trigger as fast as he could so as to empty the gun before Ritter could obtain possession of it; that one of the shots struck Ritter and he fell; that he, defendant, and his companions then immediately returned to Ste. Genevieve and that they did not throw the bodies in the river or throw stones upon the deceased. Defendant also denied having robbed Ritter or Panchot. Defendant testified that whatever he told the sheriff about the affair was done under duress and in fear of a mob and that such statements as were inconsistent with his testimony were untrue.

Defendant in his motion for a new trial questioned the jurisdiction of the court of St. Francois County to try the case. The facts that created this question are: The original information in this case was dismissed, after a change of venue had been granted, and the case sent to St. Francois County. A new information was filed in the Circuit Court of Ste. Genevieve County on December 6, 1930. Defendant was arraigned on December 13, 1930. At this time defendant objected to any action being taken, for the reason that the Circuit Court of Ste. Genevieve had adjourned for the term and that no notice of a special term had been given defendant, as required by Section 1852, Revised Statutes 1929. The record of the circuit court does not support defendant's contention. It reads: "Thereupon, and on the same day, to-wit: December 13, 1930, at and during the adjourned October term, 1930, of said circuit court, the following proceedings were had in this cause, number 1150:" It is clear, from the record, that no special term of court had been called, as provided by Section 1852, supra. Therefore, no notice was necessary, as required by that section. ▆▆ A circuit court may adjourn to a day

certain and in that case it is not a special term but simply an adjourned term of the regular term and any business may be transacted the same as at the regular term without the statutory notice mentioned in Section 1852. It is in fact a continuation of the regular term of court. The point is, therefore, ruled against defendant.

■ Appellant also assigns error on the part of the Circuit Court of Ste. Genevieve County in refusing to transfer the case to a county outside of the circuit and in refusing to allow appellant time in which to get signatures of residents from every county in the Twenty-seventh Judicial Circuit in support of his petition for a change of venue. Appellant filed an application for a change of venue from the entire judicial circuit. This petition was not supported by the affidavit of any witness. Section 3630, Revised Statutes 1929, requires the application to be supported by the affidavits of at least two credible disinterested witnesses of the county. [State v. Kocian, 208 S. W. 44.] When the application for a change of venue to the original information was before the court, the court heard evidence in support thereof and defendant offered newspaper articles and oral evidence to prove that the inhabitants of the entire circuit were prejudiced against him. The State offered evidence tending to prove the contrary. At that hearing the defendant did not ask for time to get more evidence. The court denied the application as to the entire circuit, but granted a change of venue to the county. At the hearing, on the application for a change of venue to the second information, the trial court held that the application did not meet with the requirements of the statute. The court was correct in so holding. [State v. Kocian, supra.] There was, therefore, no application before the court. The court of its own motion again transferred the case to St. Francois County. The question of prejudice of the entire circuit had been determined by the court on the first application for a change of venue, and from the evidence introduced at that hearing we hold that the court did not abuse its discretion in refusing to send the case to a county outside the circuit. If there ever was any unusual excitement, created by the commission of the alleged crime, in the counties surrounding Ste. Genevieve County, which the record does not show, by the time the case is retried it will no doubt have subsided so that the defendant will not be harmed by any prejudice on the part of the inhabitants.

■ Defendant in assignments numbers 14, 15, 16, 17, 18 and 19 complains of the ruling of the trial court in the admission of evidence. Dr. M. J. Pulliam testified as to the extent and nature of the injuries he discovered on Ritter's body, while deceased was in the hospital. Defendant asserts that there was no showing that the Ritter mentioned in Dr. Pulliam's testimony was the same Ritter mentioned

in the information. The same or similar points are made as to the X-ray pictures taken of Ritter's body. These questions need not be discussed at length. The identity of Ritter and also of the X-ray pictures was proven beyond a doubt, and defendant's objections, as to the admissibility of this evidence, are without merit.

■ Defendant also contends that the court erred in admitting in evidence statements made, by deceased, as a dying declaration. The reason, assigned in the motion for a new trial, is that the purported statements show vengeance and passion. In reading the record we cannot discover any vengeance or passion. The statements of deceased as to the material facts are in harmony with the statements made by defendant, as testified to by Sheriff Zeigler of Ste. Genevieve County. It is within the province of the jury to give such statements the credit and weight they deem proper, taking into consideration the circumstances under which they were made.

■ Defendant next complains of that part of the testimony of witness Duggan, relating to Ritter's purported statements, made in answer to Duggan's questions, while deceased was in the river trying to get to shore. These statements were admitted on the theory that they were part of the *res gestae*. The principal objections urged are that the statements were mere narrations of past events, not spontaneous, and were made too long after the commission of the alleged crime. Under the State's theory of the case, which is strongly supported by the surrounding circumstances, the defendant and his companions shot Panchot and Ritter and then threw their bodies in the river. Panchot was dead. Ritter showed signs of life and attempted to get to the shore. The negroes then threw stones at Ritter and struck him upon the head. One of the stones penetrated the brain. Duggan testified that he heard a noise at the water then, after all was quiet for a short time, he heard moans and cries for help. It is evident that deceased was rendered unconscious by the blows upon his head. When the statements were made to Duggan, Ritter was attempting to extricate himself from the water and the dangerous position in which defendant had placed him. In 16 Corpus Juris, page 573, section 1114, we find the following on the subject of *res gestae*:

"While the question of *res gestae* depends in a great measure on the circumstances of each case, especially as regards the matter of time, and a certain measure of discretion is vested in the trial court, certain general principles are regarded as well settled. For an act or declaration to be included in the accompanying circumstances which may be given in evidence with the principal fact or transaction, there must be a principal fact or transaction, the idea of *res gestae* presupposing a main fact; and to be admissible as part of the *res ges-*

*tae* the act or declaration must be substantially contemporaneous with the main fact, must spontaneously spring out of it, must tend to illustrate, elucidate, or characterize it, must so harmonize and be connected with it as obviously to constitute one transaction, and must not in effect be a mere narrative of a past occurrence. However, the word 'contemporaneous,' as employed in the rule, is not to be taken in its strict meaning, nor is time the only criterion for determining whether a thing said or done is part of a given transaction, although closeness in point of time is an element for consideration; the ultimate test is spontaneity and logical relation to the main event, and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstance and at a time so near it as to preclude the idea of deliberation and fabrication, it is to be regarded as contemporaneous within the meaning of the rule." [See, also, 16 C. J. 577, sec: 1119; Caldwell v. State, 295 Pac. (Okla.) 1. c. 232 (2); O'Neal v. State, 158 S. E. (Ga.) 51; Freeman v. State, 239 S. W. (Tex.) 969.] The statements of deceased to Duggan were clearly admissible as a part of the *res gestae*. The mere fact that thirty minutes elapsed, between the time deceased was thrown in the water and the time the statements were made, does not of itself render the statements inadmissible, especially when we consider the fact that deceased had been stoned and rendered unconscious.

 Assignments of error numbers 22 and 23 relate to the argument of the State's attorney to the jury. In the bill of exceptions we find the following to have occurred during the argument of the Prosecuting Attorney of St. Francois County.

"MR. SMITH: . . . And I am sure it is a known fact that I have not been in the habit of making unfair recommendations to my juries—

"MR. ESPY: We object to that, Your Honor, as being improper and prejudicial argument—

"THE COURT: The objection is sustained to that.

"MR. ESPY: . . . and ask the Court to instruct the jury to pay no attention to that kind of a remark by the Prosecuting Attorney.

"THE COURT: Yes. The jury will pay no attention to that remark. The Court has instructed counsel to stay within the record—don't get out of the record anymore."

While the Assistant Attorney-General was making his argument the following occurred.

"MR. PURTEET: The eyes of the people of Ste. Genevieve County are on you, the eyes of the people of St. Francois County are on you, and the eyes of the people of Missouri are on you—whether it will be

necessary to resort to mob rule or whether the majesty of the law is sufficient—

"MR. REDMOND: The Court please, we object to—

"MR. PURTEET: . . . to punish such crimes.

"MR. REDMOND: Mr. Purteet, won't you please let the Court rule on my objection?

"MR. PURTEET: I didn't hear you.

"MR. REDMOND: I am objecting to that because unwarranted, wholly outside of the record and prejudicial.

"THE COURT: The objection is sustained. The question of mob rule is not in the case, and you must not refer to that.

"MR. PURTEET: I am asking them, Judge, whether the law is adequate to punish crimes of this kind.

"MR. REDMOND: We ask, Your Honor, that the jury be discharged and a mistrial declared.

"THE COURT: The request is refused. The jury are instructed that you are not to pay any attention to that sort of argument.

"MR. REDMOND: Save our exception to the argument of counsel and to the ruling of the Court.

"THE COURT: Proceed with the argument.

"MR. PURTEET: . . . Bring in the death penalty, and you will receive the commendation of the law abiding people of Missouri.

"MR. REDMOND: We object to that statement because unwarranted, prejudicial and outside of the record, and we ask that counsel be reprimanded for saying it.

"THE COURT: The objection is sustained. The jury will not pay any attention to that remark.

"MR. PURTEET: Gentlemen, I probably should not have said that.

"MR. REDMOND: Save our exception."

The statement, by the prosecuting attorney, to the effect that it is a known fact that he did not make unfair recommendations to the jury, violates the rule that a prosecuting attorney is not permitted to state his opinion of defendant's guilt, unless based on the evidence. A prosecutor may make recommendations as to the punishment and guilt of a defendant, but such recommendations must be based on the evidence and not on the reputation of the prosecutor's fairness. The court sustained the objection and admonished the jury to disregard the statement. Therefore, no prejudicial error resulted.

The argument of the Assistant Attorney-General can only be interpreted to mean that if the jury in this case refused to convict the defendant and assess the death penalty, a mob would do so. The alleged crime was one that would naturally arouse the prejudice of the public. Cases where the deeds were less atrocious have resulted in the forming of mobs and exacting the death penalty without a

trial. Such cases always leave an odious stain upon civilization. Courts of justice must not sway one iota from the orderly procedure of administering justice under the lash of threatening mobs. While it is a regrettable occurrence, when the mob takes the law into its own hands and without trial administers punishment, it is better that that be done than to attain the same end under the guise of a pretended trial in a court of justice. The trial court in this case sustained the objection to the argument and admonished the jury to disregard any reference to mob rule. There are, however, some cases where the trial court is powerless to extract the poison that has been injected into the case. [People v. Pantages, 297 Pac. (Cal.) 890; Burrows v. State, 297 Pac. (Ariz.) 1. c. 1036 (18) ; State v. Nicholson (Mo. App.), 7 S. W. (2d) 375; State v. Hayes (Mo.), 19 S. W. (2d) 1. c. 887 (6) ; State v. Watson (Mo.), 1 S. W. (2d) 837; State v. Washington, 136 La. 855, 67 So. 930; State v. Nyhus, 19 N. D. 326, 124 N. W. 71; Watson v. State, 7 Okla. Cr. 590, 124 Pac. 1101.]

In the present case reference was made in the testimony that a mob had formed in Ste. Genevieve County, shortly after the alleged crime was committed, for the purpose of lynching the defendant. This evidence was introduced to show that defendant made incriminating statements in fear of the mob. Under these circumstances the argument under discussion tended to improperly influence the jury and persuade them to return a verdict of guilty and assess the death penalty to satisfy the wishes of the mob. Such argument is highly improper. [State v. Jackson, 95 Mo. 623, 8 S. W. 1. c. 762.] The trial court should have declared a new trial on account of the argument.

■ The evidence in this case was ample to convict the defendant. The punishment assessed, if the jury believed the State's witnesses, was well merited. However, we cannot establish one rule of law for the guilty and a different rule for the innocent. Judge FARRIS in State v. Guerringer, 265 Mo. 408, 178 S. W. 1. c. 68, speaking for this court said: "To say that he is guilty, and therefore it makes no difference how he was tried, begs the question, and is but an argument favoring the return to primitive justice, which first hangs and then investigates. If the latter method had met the demands of civilization . . . it is probable that it would not have been abandoned for the present system, which among its necessary elements requires a judiciary sworn to follow the law and the Constitution." In State v. Nicholson, supra, we read: "All persons, the guilty as well as the innocent, have an equal standing before the law and must receive the same fair treatment at the hands of the court and the prosecuting officers provided for the enforcement of the law."

Since the case must be retried, it will not be necessary to discuss other questions presented for our review. Among them we find that defendant complains of a failure of the trial court to grant defendant a continuance on account of absent witnesses. Defendant also filed a motion to quash the jury panel, which was overruled by the court. These questions of course cannot occur again under the same circumstances.

For the error indicated, the judgment is reversed and the cause remanded for a new trial. *Cooley* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All of the judges concur.