STATE of Missouri, Respondent,

v.

Helen SUTTON, Appellant.

No. 53791.

Supreme Court of Missouri,
Division No. 2.

En Banc.

July 14, 1969.

As Corrected and Dissenting Opinions
March 9, 1970.

John C. Danforth, Atty. Gen., Gene E.
V--'gts, Asst. Atty. Gen., Jefferson City,

Richard K. Wilson, Special Asst. Atty. Gen., Springfield, for respondent.

Edward A. Glenn, Jackson L. Smith, Louisiana, for appellant.

BARRETT, Commissioner.

Charged with murder in the shooting of her husband, a jury found the appellant, Helen Frances Sutton, guilty "of involuntary manslaughter by reason of culpable negligence" and fixed her punishment at two years' imprisonment.

Lonnie Sutton and Helen had both been previously married and three of her children, boys 7 and 8 and Julia, age 15, lived with them. It should be interpolated that, especially after beer drinking bouts, Lonnie's and Helen's life was rough and tempestuous, marked by violent cursings and fights. On July 22, 1967, there was an all-day picnic at Sunset Park and the Suttons, in a pickup truck, all went to the picnic at 9:30 in the morning. Lonnie left the picnic ground almost immediately with Helen's former husband, the father of Julia, and Guy Trainor and proceeded to the beer taverns. At midday another woman in the party took Julia to town searching for Lonnie, they found him in Johnnie Cotton's tavern but he refused to return to the park for the picnic lunch. In the afternoon Helen took Julia and the two boys in the pickup to a baseball game and then she went in search of Lonnie but was unable to find him, and after the baseball game, but before dark, they went home but no one was there and again they left in the pickup and went to Bowling Green in search of Lonnie but were unable to find him and after driving around returned to Louisiana and finally home. This time it was after dark and Lonnie was home.

Julia says that as her mother stopped the truck Lonnie came out of the house "went out to the driver's side and started beating on her" with his fists. Julia attempted to separate them and Lonnie "started after me." Both mother and daughter got away from him but Lonnie "took the littlest" boy, a boy with blurred vision, in the house, the other boy went to a neighbor's for unavailable help, and Helen and Julia "went inside to get my little brother." Lonnie and the boys were in the kitchen, Lonnie at the table near the sink. Helen called Lonnie a "son-of-a-bitch," and he threatened to "knock her across the room." Helen went to the bedroom and "took down" the always loaded .22-caliber single-shot, bolt-action Ranger rifle. Julia says that her mother was trying to put a shell in the gun, there were some shells on a table, and returned to the kitchen. This is Julia's description of the shooting and wounding: "She had it pointed towards the ceiling and I was going to take it away and it went down and he stood up and it discharged. * * * I just said, 'Give the gun here.' I was—and then she brought it down and he stood up and it just went off." She did not remember whether her mother had her finger on the trigger. She testified that Lonnie didn't "say anything." The gun discharged and Julia says, "As we was going out the door I took the gun and put it in the corner by the door and took mom outside." She says they "more or less" ran out the door but, not knowing where the bullet went, did not look back, got the two boys and drove away in the truck. They went to the stepgrandmother's home in Bowling Green, Julia went in "and got my stepmother" and they all returned to the fairgrounds and after Helen's talking "to my stepmother and my father" they started home again and were stopped by a highway patrol officer at 11:45, as she drove to the rear of the B & B Tavern, eleven or twelve miles from the Sutton home. The inference from Julia's testimony is that this is the first knowledge she, and inferentially her mother, had that Lonnie had been shot. The patrolman says that after advising Helen of her rights "(s)he denied having been there." The next day, however, "she more or less corroborated the story of her daughter." The ambulance driver said that Lonnie, dressed only in shorts and a jersey shirt, was wounded in the left abdomen and was dead on arrival at the hospital

emergency room from a severed left iliac artery.

This brief resume of the immediate circumstances insofar as they relate to the substantive offense of "involuntary manslaughter by reason of culpable negligence," is sufficient to illustrate that the jury's verdict is supported by substantial evidence. State v. Foster, Mo., 338 S.W.2d 892, 896; 40 C.J.S. Homicide § 62, p. 928.

In this background the crux of this appeal is whether the court erred in overruling the appellant's motion to suppress certain evidence, the gun, shells and three photographs, as well as her objections to their introduction, on the asserted ground that it was the product of an illegal search and seizure and therefore a direct invasion of her constitutionally protected rights. Annotation to Mapp v. Ohio, 6 L.Ed.2d 1544.

These are the additional circumstances in which this problem arose: In the first place and important here is the ownership and locale of the Sutton home. It was stipulated that the property was owned by Lonnie and Helen "in an estate by the entirety." It is north of Highway 54, 200 yards west of the Champ Clark Cafe and about two and one-half miles from Louisiana. The house is off the main road on Kelly Lane about an eighth of a mile—the lane dead ends at the Sutton home. Shortly after 10 o'clock, Sharon Wessel, the telephone operator in Hannibal received a telephone call from Louisiana, a male voice identified himself as Lonnie Sutton. He said "That his wife had shot him and to call him an ambulance, he was dying." The operator kept that line open and could hear "moaning in the background." Once "He was wondering where the ambulance was." On another line the telephone operator called Mr. Collier, the ambulance owner-driver, in Louisiana and reported her conversation. The ambulance driver testified that over the open line Lonnie identified himself "said that his wife had shot him. That he needed help. To come quickly,

words to that effect." Collier, not knowing the exact location of the Sutton home, called the Louisiana town marshal, Mr. Lindsay, and reported the conversation. Lindsay in turn communicated by radio with Sheriff Marshall and they agreed to meet at the Sutton residence. The ambulance operator Collier, accompanied by a neighbor, Burbridge, and Simpson arrived at the Suttons' first, in about ten minutes after receiving the telephone call. He immediately entered the house, only Sutton was there, on the kitchen floor on his side and unconscious. Collier noticed the telephone off the hook, the telephone operator in Hannibal said that she heard the ambulance arrive, told Mrs. Wessel of his arrival, it was then 10:45, hung up the telephone and proceeded on his way to the hospital in Louisiana with Lonnie.

One eighth of a mile from the Sutton house Marshall Lindsay met and passed the ambulance. In the meanwhile he too, at 10:30, had talked to Lonnie. He had known him for years and recognized his voice. Lindsay arrived at the Sutton place and waited a few minutes for Sheriff Marshall. The house was unlocked and, of course, there was no one in the house when the sheriff and marshal entered. Upon entry they immediately observed the rifle "(s)itting near the door in the north side of the room." Beer cans were scattered about and the sheriff said that the single-shot, bolt-action .22-caliber rifle was leaning against the sink. The sheriff took three pictures of the kitchen, including the rifle. He found an unexpelled shell on the floor near the icebox, an expelled shell in the rifle. He removed all these objects and turned them over to the highway patrol for ballistics tests. The ballistics expert, incidentally, testified that the single-shot, bolt-action rifle could only be fired in this manner: "Pull back on this portion of the bolt or the firing pin mechanism to actually compress a spring and pull it into a cocked position." As stated a highway patrolman stopped the appellant at 11:45 or 11:50 on Highway 61 near Bowling Green. He released her, however, and the next day she was inter-

rogated by the prosecuting attorney and the sheriff and finally charged with killing her husband.

Appellant's diligent, indefatigable, court-appointed lawyer contends that there was an illegal search and seizure, that the gun, shells and photographs were inadmissible in evidence because the sheriff and marshal entered the house without a warrant, that the entry, search and seizure were not incidental to an arrest and therefore, of course, the court erred in not sustaining the motion to suppress and the objections to the introduction of the evidence. In opposition the state contends, even though there was no search warrant and no arrest, that the search and seizure were nevertheless lawful because (a) "the search was pursuant to consent by one of the joint owners of the property in that the decedent had requested the authorities to come to his home to his immediate assistance and the entry was made pursuant to such request" and (b) that the entry and subsequent discovery of the evidence "was authorized under the circumstances as an 'emergency' or 'exceptional situation.'"

 In connection with these points it is necessary to make certain preliminary and differentiating observations. This jurisdiction in the deservedly leading cases of State v. Owens, 302 Mo. 348, 259 S.W. 100, 32 A.L.R. 383, and State v. Lock, 302 Mo. 400, 259 S.W. 116, adopted the rule that evidence obtained by an illegal search and seizure by the state is not admissible against the defendant in a criminal case for the reason that the admission of such evidence violates his constitutional security against unreasonable search and seizure. State v. Wilkerson, 349 Mo. 205, 159 S.W. 2d 794. Also in this connection in this jurisdiction persons with equal authority over premises may authorize an entry—as a tenant occupying an apartment with another, State v. Stuart, Mo., 415 S.W.2d 766 and very recently see Frazier v. Cupp, 39.' U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684, April 22, 1969. In that case it should be noted, however, that as the police entered

the defendant was observed in the act of committing a felony and was immediately arrested. In the consent to search and seizure cases there is a conflict of authority as to the existence of implied authority on the part of a wife to consent to a search of her husband's premises and a seizure of property. Annotation 31 A.L.R.2d 1078, 1091; State v. Wilkerson, supra. In this case the inference of a consent to search and seize is somewhat tenuous, Lonnie in his extremities was in fact asking for help, and it is not necessary to a decision of this appeal to consider this phase of the arguments. There is no disposition to modify the rules as set forth in the Owens and Lock cases or the rules relating to consent, or, finally, the limitations of search incident to an arrest. Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856; Recznik v. City of Lorain, 393 U.S. 166, 89 S.Ct. 342, 21 L.Ed.2d 317. The search and seizure here were not contemporaneous with the appellant's arrest.

It is not necessary to again relate the circumstances in which the sheriff and the marshal entered the Sutton home, without factual demonstrations and characterization, however, their entry and subsequent observations were justified by the exigencies of the situation and in fact demanded by the nature of their duties as peace and law enforcement officers. This recent doctrine had its genesis in an incompletely articulated one-sentence dictum by Mr. Justice Jackson in 1947: "There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with." Johnson v. United States, 333 U.S. 10, 14–15, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440–441. And in 1948 concurring in McDonald v. United States, 335 U.S. 451, 459, 69 S.Ct. 191, 195, 93 L.Ed. 153; "Even if one were to conclude that *urgent circumstances might justify a forced entry without a warrant*, no such emergency was present in this case." (Emphasis supplied.) The dictum was repeated in Walker v. United States, 5 Cir.,

225 F.2d 447, 449, 450: "Mr. Justice Jackson outlines the judicially created 'exceptional circumstances' under which search without a warrant may be made without being condemned as an unreasonable search." In explanation and limitation there was the further dictum: "These are limited to search as an incident to arrest, search of a movable vehicle and search which may be justified under rare circumstances to prevent threatened destruction or removal of contraband." And in 1963 then Judge Burger's dictum was in broader terms: "Breaking into a home by force is not illegal if it is reasonable in the circumstances. * * * But a warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Wayne v. United States, 115 U.S.App.D.C. 234, 318 F.2d 205, 212. In United States v. Barone, 2 Cir., 330 F.2d 543, policemen upon hearing loud screams broke into a room in a rooming house and observed counterfeit money in a flushing toilet with the defendant emerging. There the rationale of the emergent rule was expressed in part: "The right of the police to enter and investigate in an emergency *without the accompanying intent to either search or arrest is inherent in the very nature of their duties* as peace officers, and derives from the common law. * * * Indeed it is obvious that had the patrolmen been denied entry to the apartment they would have had the right, if not the duty, to gain entry forcibly."

These are the cases upon which the state relies but the factual situation here is not comparable to any of those cases, the appellant was not present, there was no observation of a crime, she was not arrested and the only reasonable inference from the officers meeting the ambulance is that Lonnie was no longer in the house and certainly not then in need of the officers' assistance. In Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, a cab driver pursued a robber to his door and his wife admitted them. But for the first time the Supreme Court quoted with approval the dictum of Mr. Justice Jackson. See also Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed. 2d 1067. And for the most part those cases rest upon an incompletely articulated doctrine. The state also relies upon a California case, People v. Gilbert, 63 Cal. 690, 47 Cal.Rptr. 909, 408 P.2d 365, but, while on other grounds, that decision was vacated in Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178. In addition, the California cases involve a statute permitting the entry of officers in certain situations. People v. Marshall, Cal., 69 Cal.Rptr. 585, 442 P.2d 665; Sabbath v. United States, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828.

The dictum of all these cases, however, became a completely articulated and acceptable doctrine or rule in three state cases and there is no persuasively overwhelming reason against its adoption in this jurisdiction and application to the particular facts and circumstances of this appeal. The first of these decisions, all cases of murder, is Davis v. State, 236 Md. 389, 204 A.2d 76. This decision is particularly important because certiorari was denied in 380 U.S. 966, 85 S.Ct. 1113, 14 L.Ed.2d 156. There the day after the homicide a real estate agent came upon the body of the deceased under a pile of debris and called the police. A police officer looked through a window and saw bare feet, the appellant. The officers entered the house, observed the defendant asleep on a bloodstained sheet, they observed blood on a back porch, also a hammer. They found other objects and specimens. Here, of course, the defendant was present in the house. In approving the search and seizure the court quoted with approval Judge Burger in the Wayne case. More clearly in point factually because the defendant was not present at the time of the search and seizure is Patrick v. State, Del., 227 A.2d 486. There

the day after the murder the body of the deceased was found by his employer in an apartment occupied by the deceased, his unfaithful mistress and the defendant. The employer called the police and they saw the deceased, "a bloody mess" and fragments of a brick near his left ear, also on the headboard a bloodstained half-brick. There, as here, the police photographed the room and took possession of the bedding, the brick fragments and a wire cord. Against the claim of unlawful search and seizure the court paraphrased the Barone and Wayne cases and perhaps for the first time spelled out the rationale of the "emergency" rule and particularly the duty of the police.

"The general rules governing searches and seizures are subject to the exception of emergency situations, sometimes called the 'exigency rule.' The reasonableness of an entry by the police upon private property is measured by the circumstances then existing. * * * As a general rule, we think, an emergency may be said to exist, within the meaning of the 'exigency' rule, whenever the police have credible information that an unnatural death has, or may have, occurred. And the criterion is the reasonableness of the belief of the police as to the existence of an emergency, not the existence of an emergency in fact."

* * * * * *

"Under the circumstances, it was the duty of the police to act forthwith upon the report of the emergency—not to speculate upon the accuracy of the report or upon legal technicalities regarding search warrants. It follows that the entry by the police was reasonable and lawful."

It is not necessary to indicate approval of all that the court said but in many respects one of the most persuasive opinions is Stevens v. State, Alaska, 443 P.2d 600. Decided in July 1968 an industrious court collected all the relevant cases including the Davis and Patrick decisions. There Stevens shot and killed his friend LaViolette in the course of a drinking bout in the early morning hours in the defendant's home in the isolated settlement of Hoonah. Neighbors called the nearest police officials, his wife opened the door and there sat Stevens "sobbing" that he had killed his "buddy." These particular officers did not make a detailed examination, they merely arrested Stevens, took him to jail and sealed up the house. The next day other officers, some trained perhaps for the task, photographed the body of the deceased and the room, retrieved empty cartridge cases and a .45-caliber pistol and made diagrams and measurements. In these circumstances the court posed the problem on appeal: "The principal question is whether a delay of approximately ten hours in conducting a homicide investigation on premises legally entered by the police in response to an emergency call, is fatal to the constitutionality of the investigation and to the admissibility of the evidence obtained." As indicated, the court noted all the appropriate cases and the evolution of the rule and concluded in the circumstances that "appellant's constitutional right of privacy was not violated."

■ Upon this theory, particularly as enunciated by these three courts, and in the particular circumstances of this record, the entry and search (insofar as a search was in fact involved) and seizure were reasonable and lawful and the court did not err in denying appellant's motion to suppress or in admitting into evidence the exhibits and photographs and the testimony of the sheriff and the marshal.

■ Appellant nevertheless contends that the court erred in overruling her motion for a new trial on three other grounds and that because of these errors this court should reverse and remand the cause. The first of these assignments is that the court prejudicially erred in permitting the telephone operator, Sharon Wessel, and the ambulance operator, Collier, to testify to their telephone conversations with Sutton. Her objection is that the conversations

were hearsay and were not made in her presence. Mistakenly the state contends, in part, that the defendant failed to move to strike the provisionally admitted ("subject to being connected up") testimony and therefore waived the right to complain. It may be that the appellant did not repeatedly object at various times but after initially objecting, at the conclusion of Sharon Wessel's testimony and out of the hearing of the jury her counsel said, "I should like to ask the Court that the evidence given by this witness as hearsay be stricken from the record and the jury be instructed to disregard it. The Court: Request denied." The state also urges that the admission of the conversations was harmless error because "it was tacitly conceded that defendant did shoot the decedent; the only question being whether the shooting was excusable or criminal." In this connection it is said that "defendant does not deny shooting the deceased, but bases her defense on a theory that it was accidental." It is not necessary to examine this argument in detail, the difficulty with it is that the appellant entered a plea of not guilty and she did not testify and so there are in fact no concessions whatever by her. Compare: State v. Hayes, Mo., 247 S.W. 165. The only evidence offered by appellant related to photographs of herself showing bruises allegedly inflicted by her husband. Finally, citing only State v. Hook, Mo., 432 S.W.2d 349, a child molestation case, the state urges that the telephone conversations were "admissible under the res gestae exception to the hearsay rule."

It is not necessary to enter upon an exploration of "res gestae." It is only necessary here to lay aside statements that may or may not have qualified as dying declarations. State v. Proctor, Mo., 269 S. W.2d 624, 48 A.L.R.2d 724; State v. Custer, 336 Mo. 514, 80 S.W.2d 176, cases cited by the appellant. Also to be put aside are the cases in which defendants attempt to introduce exculpating statements by a dying victim. Annotation 95 A.L.R.2d 637 and State v. Cook, Mo., 44 S.W.2d 90; State v. Livingston, Mo., 204 S.W. 262, relied on by appellant. Nor is it necessary to again relate the telephone conversations and point out the circumstances in which they were had. It is sufficient to say that Lonnie Sutton's call and statement to the telephone operator and shortly his conversation and the same statement to Collier were contemporaneous if not immediate and were instinctive and spontaneous and their reliability and trustworthiness assured if not guaranteed by the solemnity of the occasion. The time interval, between the shooting and the call, was but a few minutes, soon enough to preclude deliberation, fabrication or design. There was no "break in the continuity of the event," such as Lonnie's engaging in certain other acts or communicating with others. Annotation 4 A.L.R.3d 149. And the conversations occurred before Lonnie had been removed from the place of his wounding. State v. Kelleher, 201 Mo. 614, 100 S. W. 470. The theory of admissibility as a statement meeting all the requirements of an instinctive spontaneous utterance with all the assurances of trustworthiness is supported by State v. Hart, 309 Mo. 77, 274 S.W. 385, "Q. What did John Less say when you got there and found him in that position that you indicated a while ago? A. He said: 'Send me to the Sisters' Hospital; call my wife; Charlie Hart shot me. Get him boys.'" And State v. Taylor, 330 Mo. 1036, 51 S.W.2d 1003, in which the victim had been shot and stoned and thrown in a river for dead. Thirty minutes later a witness responding to groans inquired what happened and the victim replied "Two *niggers* shot me. They held me up. They've *throwed* rocks on me." And while put on the ground of res gestae see State v. Martin, 124 Mo. 514, 28 S.W. 12, "Yes; two negroes; one a little yellow fellow." For the reasons indicated by these latter cases it may not be said that the court prejudicially erred in admitting in evidence the telephone conversations between Sutton, Wessel and Collier.

In connection with the trial in chief the appellant contends that the court erred in permitting the state "to cross-examine and to attempt to impeach the State's own witness," Julia, without a showing of entrapment or hostility. It is not necessary to enter upon an extended examination of the circumstances and the subject, it is sufficient to say that Julia did not entrap the state nor does it appear that she was in fact hostile. On the other hand, it may not be said that the state "impeached" her or so cross-examined her as to arouse the hostility or suspicion of the jury. For the most part the state rather asked her leading questions after receiving certain answers it had not expected. It is the general rule that a party, in either a civil or criminal case, may not discredit or impeach his own witness and criminal cases in which there was no artifice or entrapment have been reversed when there was obvious prejudice and manifest abuse of discretion, as in permitting the state to impeach a witness with his grand jury testimony. State v. Bowen, 263 Mo. 279, 172 S.W. 367. But in this case the state's examination of Julia was not manifestly prejudicial and it may not be said that the court abused its discretion in permitting it. State v. Todd, Mo., 372 S.W.2d 133, 137; State v. Shelton, 351 Mo. 799, 174 S.W.2d 202, 205; State v. Taylor, Mo., 324 S.W.2d 643, 76 A.L.R.2d 671; 58 Am.Jur. (Witnesses) Secs. 792-802.

As stated the defendant called but one witness and recalled Julia. The called witness was a photographer, Florence Guthrie, who on July 25, 1967, three days after the homicide, took twelve colored photographs of Helen showing, purportedly, various bruises and contusions, including a black eye, said to have been inflicted by Lonnie just prior to the shooting. This witness did not describe the bruises but Julia was recalled, shown the photographs and testified that they showed her mother's bruises as they appeared on the following day. Because of "the time lapse between the 22nd and 25th without further connec-tion" the court sustained an objection to the introduction of the photographs and they were not shown to the jury. The appellant's final contention is that on the finding of involuntary manslaughter by culpable negligence the photographs were material and relevant on "the issue of her justification in arming herself against further injury" and that because of their exclusion she is entitled to a new trial. It may be said in passing that it would have been proper for the court to have admitted the photographs (State v. McGee, 336 Mo. 1082, 1096-1097, 83 S.W.2d 98, 106-107) but in view of Julia's testimony and in all the circumstances it may not be said that the court's exclusion of them constituted such manifest, prejudicial error that this court should order a new trial. 41 C.J.S. Homicide § 426, p. 283; 24B C.J.S. Criminal Law § 1918(3), p. 138; State v. Brown, Mo., 404 S.W.2d 179, 183.

For all the indicated reasons the judgment is affirmed.

PER CURIAM:

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

Affirmed.

HENLEY, C. J. and DONNELLY, MORGAN and HOLMAN, JJ., concur; BRADY, Sp. J., concurs in result; FINCH & SEILER, JJ., dissent in separate dissenting opinions filed; STORCKMAN, J., not sitting.

FINCH, Judge (dissenting).

I respectfully dissent from the principal opinion. Contrary thereto, I would hold that the motion to suppress evidence seized during the search of the Sutton house should have been sustained. I also would hold that it was error to admit in evidence, over objection, the fruit and product of the unlawful search and seizure. Accordingly, I would reverse and remand.

The critical issue in this case is the propriety of the entry by Officers Lindsay

and Marshall into the unoccupied Sutton home at about 10:45 p. m. on July 22, 1967, when they arrived there after the ambulance driver had picked up Lonnie Sutton to take him to the hospital.

The principal opinion holds that the entry by the officers and the subsequent search and seizure were permissible under what it describes as the emergency or exigency rule. I will discuss that rule and its applicability subsequently, but in order clearly to delineate the narrow issue presented it is necessary to note various conclusions arrived at in the principal opinion, as follows:

1. This was not an entry and search and seizure pursuant to a search warrant. There was no search warrant.

2. The search and seizure were not contemporaneous with and incidental to a lawful arrest. The defendant was not at the Sutton home at that time and was not even arrested until later that night at another location.

3. The opinion does not rely on consent by Sutton to justify the search. This clearly is so because the principal opinion says: "In this case the inference of a consent to search and seize is somewhat tenuous, Lonnie in his extremities was in fact asking for help, and it is not necessary to a decision of this appeal to consider this phase of the arguments." [1]

4. This is not a situation where the items seized were in plain view of the officers before entering. The principal opinion does not base its result on any clear view doctrine, and the sheriff testified specifically that he could not, from outside the house, see the items later seized. It was necessary for the officers to open the screen door, cross the porch, and cross the living room before the articles could be seen in the kitchen through the doorway between the living room and kitchen.

5. The entry was not justified on the basis that the officers entered because they thought that Lonnie Sutton was lying in the house in need of medical attention. This is made clear by the principal opinion when, after referring to various cases cited by the state, it says: "These are the cases upon which the state relies but the factual situation here is not comparable to any of those cases, the appellant was not present, there was no observation of a crime, she was not arrested and the only reasonable inference from the officers meeting the ambulance is that Lonnie was no longer in the house and certainly not then in need of the officers' assistance."

6. This was not a case of hot pursuit. The statement from the principal opinion quoted in the preceding paragraph clearly discloses this and shows that the court's holding was not based on any such theory.

---

1. In addition to the fact that the principal opinion expressly declines to rely on consent as a basis for its conclusion, I am of the view that the evidence would not justify a reliance on consent as authorization for the entry and search.
Lonnie called the telephone operator and told her that his wife had shot him and he was dying and to call an ambulance. The operator connected him with the ambulance owner, to whom Lonnie said he needed help and to come quickly. The operator kept the telephone line open and heard Lonnie wondering where the ambulance was. Lonnie didn't ask for officers and he did not talk to any officer. He was concerned about his physical condition as a result of a shooting and wanted an ambulance. The ambulance arrived, picked him up, and started for the hospital before any officer arrived, which the officers knew. Thereafter, the officers could not aid Lonnie by entering the house. What Lonnie had said over the telephone, and obviously was thinking about, had nothing to do with consent for officers to enter the house for purposes of search and seizure. There was no such consent. As the principal opinion says, the inference of a consent in this situation to search and seize would be tenuous.

After eliminating as a basis for the entry and search the exceptions enumerated in the above paragraphs, the opinion then holds that the entry, search and seizure were lawful and reasonable under the emergency or exigency rule, and that the court did not err in overruling the motion to suppress or in admitting into evidence the fruits of the search. In reviewing the validity of these conclusions, we start with the proposition that warrantless searches "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576. This was a warrantless search and the question, therefore, is whether this search and seizure falls within the so-called emergency or exigency exception. In determining this question, we must recognize that the cases establish that where the government seeks to justify a warrantless search on the basis that it falls within some exception to the rule requiring a search warrant, the burden of proof to establish that some exception is applicable rests on the government. Thus, in McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153, the court said: "We cannot be true to that constitutional requirement and excuse the absence of a search warrant *without a showing by those who seek exemption from the constitutional mandate* that the exigencies of the situation made that course imperative." (Emphasis supplied.) Likewise, in United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59, the Supreme Court again emphasized the requirement of a search warrant to comply with the Fourth Amendment protection against unreasonable search and seizure, and then said, 342 U.S. l. c. 51, 72 S.Ct. l. c. 95: "Only where incident to a valid arrest, United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), or in 'exceptional circumstances,' Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), may an exemption lie, *and then the burden is on those seeking the exemption to show the need for it,* McDonald v. United States, 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948)." (Emphasis supplied.) The question, then, is whether the state sustained its burden of proving that this entry and search falls within the exception on which the opinion relies, namely, the emergency or exigency rule.

The transcript discloses that the defendant filed a motion to suppress items obtained in the search and seizure of the Sutton home. Counsel for defendant, in support of the motion, offered a portion of a letter which he had written to the circuit judge which contained a recital of certain facts, and which the state stipulated could be received in evidence as an agreed statement of facts on the motion to suppress. That stipulation was as follows:

"Facts: During the evening of July 22nd, 1967, George M. Collier, an Ambulance operator, of Louisiana, Missouri, received a telephone call from a man who identified himself as Lonnie Sutton, the deceased. The caller stated that his wife had shot him and he needed help in a hurry. Collier called J. W. Lindsay, Marshall for the City of Louisiana, advised the Marshall of the call and obtained directions to reach the Sutton home. Marshall Lindsay was undressed at the time. He called Sheriff Marshall's home by telephone and the Marshall responded by radio. Lindsay proceeded to the Sutton home and on the way there met the Collier ambulance returning. Upon reaching the Sutton home, Lindsay waited for the Sheriff near the Sutton house. When the Sheriff arrived a few minutes later, Sheriff Marshall and Marshall Lindsay who had been informed by radio from Collier's ambulance that he had found Sutton lying in the kitchen, entered the Sutton home and there conducted a search which disclosed a Twenty-two, single shot, bolt action rifle, some empty beer cans, an unfired Twenty-two caliber cartridge, some clothing, etc. The officers did not have a

search warrant at the time of their entry into the Sutton home. The title to the property referred to as the Sutton home is in an estate by the entirety, Lonnie J. Sutton and Helen Sutton, husband and wife. Helen Sutton is the Defendant in this cause. No one was present at the time of the search of the Sutton residence except the officers, James M. Marshall and J. W. Lindsay. No arrest was made until sometime subsequent to the search."

In addition to the above, the transcript shows the following additional stipulation on the motion to dismiss:

"MR. MILLAN: If the Court please, Mr. Glenn in his memorandum to you on November 20, 1967, has set forth on page one a set of facts and the State will stipulate that those facts therein are true, but I would like to add that when Mr. Collier, the ambulance driver, was called he also had conversation with a telephone operator who had been obviously working with Mr. Sutton trying to find out what he wanted and then when he got to the Sutton home, Mr. Collier did, the line was still open and he again had conversation with the telephone operator about this very same thing. I don't think there is any controversy on that statement that I have made.

"THE COURT: Is that stipulated to, Mr. Glenn?

"MR. GLENN: Yes, sir. I don't see its materiality, but I am perfectly willing to stipulate to it."

The defendant put the sheriff on the stand and proved by him that prior to opening the door and entering the house, he was unable, from outside the house, to observe any of the articles which he later took into his possession. The defendant offered no further evidence and the state offered no evidence.

The cases upon which the principal opinion primarily relies as establishing that the foregoing evidence was sufficient to justify the entry under the emergency doctrine are the cases of Davis v. State, 236 Md. 389, 204 A.2d 76; Patrick v. State, Del., 227 A.2d 486; and Stevens v. State, Alaska, 443 P.2d 600. In Davis a body partly covered by debris was discovered by a real estate agent who was looking for a "For Sale" sign which was supposed to be posted. The agent called the officers, who came at once. They observed severe lacerations and contusions about the head and body and a discernible trail of blood leading from the body to the back porch and back door of the house. The officers knocked on the door but received no response. They then looked in a window and saw the feet of someone apparently lying down, but a partition blocked a further view of the person. The officers then forced open the door and entered, where they found defendant asleep on a couch. It was his feet which were visible through the window. There were blood stains on the sheet and other articles and the house indicated a struggle had occurred. The officers arrested the defendant and then seized numerous items which were later used as evidence in the prosecution.

The Maryland Court of Appeals, while recognizing the general requirement of a search warrant as a condition to entry and search, held that on the factual situation presented the entry was authorized by the emergency situation. In so holding, the court said, 204 A.2d 1. c. 80:

" * * * In considering the entry upon the Davis' property it is clear that the police were acting in pursuance of their duty to investigate a reported death. Thus, the status of these officers upon the curtilage of the property was not that of trespassers. Furthermore, in light of the gory scene which confronted the police in the back yard of the Davis' home, their duties with regard to investigation of the death of the person found there commanded that they determine whether more than one person had been victimized in the carnage which had obviously taken place.

"We find that the entrance of the police officers into the house was reasonable under the circumstances then existing in order to determine whether the feet which were seen therein by Lt. Denell were those of a person in distress, immediate aid to whom might, under similar circumstances, have preserved a human life. Basic humanity required that the officers offer aid to the person within the house on the very distinct possibility that this person had suffered at the hands of the perpetrator of the homicide discovered in the back yard. The delay which would necessarily have resulted from an application for a search warrant might have been the difference between life and death for the person seen exhibiting no signs of life within the house. The preservation of human life has been considered paramount to the constitutional demand of a search warrant as a condition precedent to the invasion of the privacy of a dwelling house."

The court, having found that the entry was proper, justified the search which followed as incidental to the arrest of the accused.

In Patrick v. State, supra, one Larrimore, looking for his employee, Woods, entered the latter's house and found him "in bed, a bloody 'mess,' with his head 'beaten in with a brick.'" Larrimore panicked upon making this discovery and, being unable to tell whether Woods was dead or alive, called the police. When they arrived, Larrimore told them Woods had a head wound and might be dead. The officers entered immediately and found that Woods was in fact dead. The officers seized various items, later used as exhibits, which were in plain view in the bedroom where Woods was found. The Delaware Supreme Court overruled defendant's contention that the exhibits received in evidence were obtained by unlawful search and seizure. It did so on the basis that the emergency or exigency rule was applicable in this factual situation. In so holding, the court said, 227 A.2d. 1. c. 489:

"Applying these tenets to the instant case, we have no doubt that the entry of the police was reasonable under the circumstances. The officers were informed by Larrimore that Woods was dead or dying from a head wound. Clearly, the police had good reason to believe that a life was in balance and that emergency aid might be needed. Under the circumstances, it was the duty of the police to act forthwith upon the report of the emergency—not to speculate upon the accuracy of the report or upon legal technicalities regarding search warrants. It follows that the entry by the police was reasonable and lawful."

The court went on to point out that after the lawful entry, the officers made no further search, but simply seized items which were in plain view in the room.

In Stevens v. State, supra, the defendant, during the evening, shot and killed a drinking buddy in his home in Hoonah, Alaska, a small frontier village on an island off the coast of southeastern Alaska. A neighbor notified the chief of police of Hoonah, who then went to the Stevens house and knocked on the door. Defendant's wife opened the door and, although no words were spoken by anyone, admitted the chief to the house. Defendant was sobbing, saying he had killed his buddy, and he was threatening to take his life. The chief arrested the defendant and took him to jail. He and the mayor of the village then returned to the house, viewed the body and premises, and then locked the house with a padlock. Defendant's wife, who was walking the streets and was hysterical, also was confined.

The mayor then (about 3:00 a. m.) called the state police in Juneau and was advised to keep the house padlocked. The next day the state police and the district attorney came from Juneau. They then went to the Stevens house with the chief of police

and entered the house. They photographed, took measurements, and seized items such as the gun, cartridge clip, shells, etc., which were in plain view in the room.

At the trial the defendant conceded that the original entry into the house without a search warrant by the chief of police was legal, and no attack thereon was made. Instead, defendant's contention was that the subsequent entry of the house ten hours later by the chief, the state police and the district attorney, when defendant and· his wife were not present, violated the unreasonable search and seizure provisions of the Fourth Amendment and the provisions of the Alaska Constitution.

The Supreme Court of Alaska holds that the chief of police, when he originally entered in what is conceded by defendant to be a valid entry, had a duty to inspect the premises, and had he done the photographing, measuring, and seizing of articles at that time, no constitutional rights would have been violated because everything was in plain view. The court went on to point out the remoteness of the village, the lack of trained personnel to investigate in such a place, the length of time required for others to reach the village, and holds that the lapse of ten hours did not convert what otherwise would have been a lawful investigation into a violation of defendant's constitutional rights. One judge, concurring in the opinion, justified the seizure as an incident to the arrest, holding that the lapse of time did not change that situation.

I am in agreement with the principal opinion that the emergency doctrine is a proper one and should be adopted in this state as an exception to the need of a search warrant where circumstances reasonably indicate to an officer the existence of an emergency situation which calls for immediate entry of the premises. For example, where an officer has good reason to believe that a life is endangered and emergency aid may be needed, such an emergency would justify entering the house without a search warrant. That was the situation which existed in both Davis v. State and Patrick v. State, and I agree with both of those decisions. I also agree with the dictum of Judge Burger in Wayne v. United States, 115 U.S.App.D.C. 234, 318 F.2d 205, 212: "But a warrant is not required to break down a door to enter a burning house to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency."

With reference to Stevens v. State, I do not consider it at all persuasive or relevant on the facts here presented. It involves a situation wherein it was conceded by the defendant that the original entry by the officers was proper and valid. In contrast, in this case the propriety of the entry is the very issue which the defendant from the outset has vigorously contested. In Stevens the issue was whether the delay of ten hours before the officers continued the examination of the house and seized the articles made the search and seizure bad. That is not the issue here.

My disagreement with the principal opinion relates not to the validity of the emergency rule, but to the sufficiency of the evidence on the motion to suppress to justify application of the emergency doctrine in this case. In my view, that evidence, all of which is recited heretofore in this dissent, simply does not bring this case within the emergency or exigency doctrine. The officers knew that the wounded man had been moved from the premises before they arrived at the house. The officers themselves did not testify at all on the motion to suppress and there was no evidence from any source that they entered the house because they thought someone else might be there in need of help. There was nothing comparable to the situation in Davis v. State, where the officers, after finding a mutilated body in the

yard, looked in the window and saw the feet of someone lying inside the house who might also be in need of emergency medical attention. There was absolutely nothing to indicate, using the language of Patrick, that "the police had good reason to believe that a life was in balance and that emergency aid might be needed." In short, there is not one word of testimony from the officers, or anyone else, of any emergency or exigency which existed, or which the officers believed existed, on which they might have relied in entering the house on the theory that an emergency justified entry without a search warrant.

Nor do Federal cases cited in the principal opinion as having articulated in some fashion a recognition of the emergency doctrine justify application of that exception in this case. For example, in United States v. Barone, 2 Cir., 330 F.2d 543, the entry by officers without a search warrant was justified in the opinion on the basis they had heard loud screams coming from a rooming house in the dead of night, and that they properly, under such circumstances, knocked and entered to investigate. That situation is not comparable.

In Wayne v. United States, supra, Judge Burger discussed the legality of entry by the police into the defendant's apartment. He had performed an abortion on a girl and later reported to her sister that he thought the girl was dead. The sister then fled from the apartment and notified police that her sister was in the doctor's apartment. Judge Burger's opinion states that the police thought she probably was dying or unconscious but did not know that the girl was dead. Subsequently, Judge Burger states that they were justified, in such emergency situation, in entering the doctor's apartment without a search warrant. The case was decided on other grounds, with no other judge concurring in the above discussion of whether the entry was justified under the emergency doctrine. However, even if Judge Burger's dictum had been adopted as part of the opinion, the factual situation there was completely different from

that here presented, and Wayne would not be any authority for holding that the entry by the officers into the Sutton house was justified on the basis of an emergency. In Wayne the girl was still in the doctor's apartment, either dead or dying or unconscious, and arguably an emergency existed. Nothing like that was present here. The officers knew that Lonnie Sutton had already been placed in the ambulance and taken to the hospital.

In the case of Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782, the officers, in hot pursuit of one thought to have committed a holdup, went to the door of a house and knocked, telling the defendant's wife, when she answered the door, that they thought a robber had entered her house and that they would like to search the premises. She offered no objection and they did enter and search. Obviously, that situation is not analogous to the entry by the officers into the Sutton house.

The conclusion is inescapable that the state wholly failed to sustain its burden of proving that the entry of the Sutton house by the officers was justified on the basis of the emergency exception to the Fourth Amendment requirement of a search warrant. The principal opinion justifies the entry, search and seizure wholly on the basis of the emergency exception. Necessarily, I dissent.

SEILER, Judge (dissenting).

I concur with Judge FINCH's dissent that the entry of the Sutton house and the ensuing search and seizure cannot be justified under the facts before us on the basis of emergency, and that the case should be reversed and remanded.

However, I am dubious about the need for adopting what is referred to as an exigency or emergency rule, without which we so far seem to have gotten along all right in Missouri. There never has been any doubt that a policeman or fireman is privileged to enter private premises in the

discharge of his public duty, Anderson v. Cinnamon, banc, 365 Mo. 304, 282 S.W.2d 445, 55 A.L.R.2d 516; 65 C.J.S. Negligence § 63(111), p. 866. I see no connection between the law of search warrants and the law permitting a policeman to enter a private dwelling in certain emergencies. I do not believe the latter need diminish the right of individuals to be secure against unreasonable searches and seizures in their homes. I am skeptical of what letting down the bars against warrantless searches and seizures will lead to. It would be too easy for the emergency situation to become the routine.